**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

NORTHERN VALLEY COMMUNICATIONS, L.L.C.,

      Plaintiff,

v.

QWEST COMMUNICATIONS CORPORATION,
      Defendant.

--------------------------------------------------------------------x

Civil Action No. 08-CV-6799
(GBD) (GWG)
ECF Case

**DEFENDANT QWEST COMMUNICATIONS CORPORATION'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER ACTION**
**PURSUANT TO 28 U.S.C. SECTION 1404(a)**

Dorsey & Whitney LLP
Eric B. Epstein, Esq. (EBE-8992)
250 Park Avenue
New York, New York 10177
Telephone: (212) 415-9309
Facsimile: (212) 953-7201
epstein.eric@dorsey.com

Steese & Evans, P.C.
Charles W. Steese (pro hac vice
application pending)
6400 S. Fiddlers Green Circle
Suite 1820
Denver, Colorado 80111
Telephone: (720) 200-0677
Facsimile: (720) 200-0679
csteese@s-elaw.com

*Attorneys for Defendant Qwest*
*Communications Corporation*

## TABLE OF CONTENTS

I.  RELEVANT FACTS .......................................................................................................... 1

   A.  Northern Valley is Engaged in a "Traffic Pumping" Scheme. ................................. 2

      1.  Factual Background: the Access Charge Regime......................................... 2

      2.  Traffic Pumping Abuse of the Access Charge Regime................................ 3

   B.  Northern Valley is Charging Qwest for Calls that Are Not Subject to Switched
      Access Charges.......................................................................................................... 4

      1.  The "End-User" Requirement for Switched Access Charges...................... 5

      2.  The "End-User Premises" Requirement for Switched Access Charges. .................... 6

      3.  The Local Exchange Area Requirement for Switched Access Charges. ..................... 7

   C.  Northern Valley's Decision to File the Lawsuit in This District is Based Purely on
      Forum-Shopping. ....................................................................................................... 8

      1.  Northern Valley Filed a Related Action in the South Dakota District Court. ............ 8

      2.  Northern Valley Hopes to Take Advantage of a Decision by Judge Pauley................ 9

      3.  Qwest is Already a Party to Another Traffic Pumping Case in South Dakota. .......... 9

II.  ARGUMENT: SOUTH DAKOTA IS THE MORE CONVENIENT AND FAIR FORUM FOR THIS
    ACTION. ................................................................................................................... 11

   A.  This Action Meets the Section 1404(a) Requirements: the Transferee District Is a
      Proper Venue, and the Transfer Is Warranted for Convenience and the Interest
      of Justice. ................................................................................................................. 11

   B.  Northern Valley's Choice of Venue Bears the Hallmarks of Forum-Shopping; the
      Court Should Substantially Discount this Factor. .................................................... 13

   C.  The Locus of Operative Facts: South Dakota Is Where Northern Valley Alleges it
      Provided the Services For Which It Seeks Payment ............................................... 16

   D.  Convenience of the Parties: South Dakota is More Convenient for Both Northern
      Valley and Qwest. ................................................................................................... 16

   E.  Convenience of Witnesses:  There Are No Witnesses Located in New York, and
      Northern Valley's Officers and Employees Live in South Dakota........................... 17

**F.**     **Relative Ease of Access to Sources of Proof: Plaintiff's Office in South Dakota Contains a Substantial Amount of the Relevant Evidence.** .................................... 18

**G.**     **Forum's Familiarity With Governing Law: On Issues That Are Not Governed by Federal Law, South Dakota Law Will Apply.** ......................................................... 18

**H.**     **Judicial Economy, Public Interest, and the Interest of Justice Favor Transferring this Action to South Dakota.** ...................................................................... 19

**III.**     **CONCLUSION** ..................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**

*All American Telephone Company, Inc., v. AT&T Corp.,* 2008 U.S. Dist. LEXIS 56277 (S.D.N.Y July 24, 2008).............................................................................................................. 9

*Bell Atlantic Tel. Cos. v. FCC,* 206 F.3d 1 (D.C. Cir. 2000) .......................................................... 8

*Blum v. Salomon,* 2006 U.S. Dist. LEXIS 94267 (S.D.N.Y. Dec. 26, 2006) ............................... 13

*D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95 (2nd Cir. 2006)................................................ 12, 13

*Earley v. BJ's Wholesale Club, Inc.,* 2007 U.S. Dist. LEXIS 40125 (S.D.N.Y. June 4, 2007)............................................................................................... 13, 18

*Frame v. Whole Foods Market, Inc.,* 2007 U.S. Dist. LEXIS 72720 (S.D.N.Y. Sept. 24, 2007)................................................................................................ 13, 14

*Fuji Photo Film Co. v. Lexar Media, Inc.,* 415 F. Supp. 2d 370 (S.D.N.Y. 2006)...................... 21

*Glass v. S&M NuTec, LLC,* 456 F. Supp. 2d 498 (S.D.N.Y. 2006)............................................... 11

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947) .......................................................................... 20

*Hot Stuff Food Sys. v. Griffin Petroleum,* 891 F. Supp. 499 (D.S.D. 1995) ................................ 12

*In re AtheroGenics Sec. Litig.,* 2006 U.S. Dist. LEXIS 15786 (S.D.N.Y. Mar. 31, 2006) .......... 21

*In re Connetics Sec. Litig.,* 2007 U.S. Dist. LEXIS 38480 (S.D.N.Y. May 23, 2007)................. 20

*In re Qwest Communications Corp. v. Farmers and Merchants Mutual Tel. Co.,* File No. EB-07-MD-001 at ¶32 (rel. Oct. 2, 2007) ......................................................................................... 8

*Intercontinental Mon. Corp. v. Performance Guar.,* 705 F. Supp. 144 (S.D.N.Y. 1989) ........... 19

*Iragorri v. United Techs. Corp.,* 274 F.3d 65 (2nd Cir. 2001) ........................................ 17, 18, 20

*Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb,* 2006 U.S. Dist. LEXIS 36018 (S.D.N.Y. June 5, 2006)................................................................................................... 20

*Liberty Mut. Fire Ins. v. Costco Wholesale Corp.,* 2007 U.S. Dist. LEXIS 63435 (S.D.N.Y. Aug. 27, 2007) ...................................................................................... 14, 17

*Montgomery v. TAP Enters.,* 2007 U.S. Dist. LEXIS 12702 (S.D.N.Y. Feb. 26, 2007) ............. 11

*N. Valley Communs., LLC v. MCI Commun. Servs.,* 2008 U.S. Dist. LEXIS 49484 (D.S.D. June 26, 2008)........................................................................................................... 15

*National Assoc. of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095 (D.C. Cir 1984).................. 3

*Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454 (1972)................. 19

*Ohio Bell Tel. Co. v. FCC,* 949 F.2d 864 (6th Cir. 1991).............................................................. 3

*Piper Aircraft Co. v. Reyno,* 454 U.S. 235 (1981) ....................................................................... 13

*Price v. Stossel,* 2008 U.S. Dist. LEXIS 45672 (S.D.N.Y. June 4, 2008) .................................... 15

*Royal Ins. Co. of Am. v. United States,* 998 F. Supp. 351 (S.D.N.Y. 1998) ................................ 18

*Sancom, Inc. v. Qwest Communications Corp.,* 2008 U.S. Dist. LEXIS 49491 (D.S.D. June 26, 2008)........................................................................................................... 10

*Schnabel v. Ramsey Quantitative Sys., Inc.,* 322 F. Supp. 2d 505 (S.D.N.Y. 2004) ................... 17

*Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824 (2nd Cir. 1994) ............................................. 19

*UFH Endowment, Ltd. v. Nevada Manhattan Mining, Inc.,* 2000 U.S. Dist. LEXIS 14178, 2000 WL 1457320 (S.D.N.Y. 2000)................................................................................... 13

*Van Dusen v. Barrack,* 376 U.S. 612 (1964) .............................................................................. 11

*Walker v. Jon Renau Collection, Inc.,* 423 F. Supp. 2d 115 (S.D.N.Y. 2005) ........... 11, 13, 14, 17

*Wechsler v. Macke Int'l Trade, Inc.,* 1999 U.S. Dist. LEXIS 19800, 1999 WL 1261251 (S.D.N.Y. Dec. 27, 1999) .................................................................................................. 13

**Statutes**

28 U.S.C. § 1391 .................................................................................................. 12

28 U.S.C. § 1404(a) ........................................................................................... 11

S.D. Codified Laws Ann. § 49-31-5 (1, 3, 5, 14) ............................................... 19

**Rules**

Fed. R. Civ. P. 45(c)(3)(B)(iii) .......................................................................... 17

**Treatises**

17-111 *Moore's Federal Practice - Civil* § 111.17 ............................................. 11

Defendant Qwest Communications Corporation ("Qwest") respectfully submits this memorandum of law in support of its motion pursuant to 28 U.S.C. § 1404(a), to transfer this action to the United States District Court for the District of South Dakota ("South Dakota District Court"). The South Dakota District Court is clearly the venue that is most convenient to the parties and witnesses, the most connected to the parties' dispute, and the most fair in the interest of justice. Northern Valley Communications, L.L.C. ("Northern Valley")'s decision to file the lawsuit in this Court is the result of forum-shopping, not any connection between this district and the parties' dispute. The South Dakota District Court is Northern Valley's home forum, and Northern Valley already filed a related action in that forum, raising essentially the same allegations against MCI that is has brought against Qwest in this case. Indeed, Qwest is already party to another action in South Dakota brought by another South Dakota local carrier alleging the same claims as Northern Valley.

Convenience, fairness, judicial economy and many other factors all weigh in favor of this action proceeding in Northern Valley's home forum of South Dakota. Accordingly, the Court should transfer this action to the South Dakota District Court.

## I.  RELEVANT FACTS

Understanding the factual complexity of Northern Valley's claims is critical to the Court's determination of whether to transfer the action. Northern Valley's complaint does not provide the details necessary for such an understanding. Therefore, Qwest here outlines the factual issues of which Qwest is aware at this point. Discovery – much of which is located in South Dakota – will be necessary to flesh out these facts and to determine what additional factual issues exist as well.

A.    **Northern Valley is Engaged in a "Traffic Pumping" Scheme.**

Northern Valley frames its lawsuit as a simple collection action for reimbursement of charges Qwest is obligated to pay under state and federal access tariffs.  Complaint at ¶1.  In reality, this case is anything but a simple collection action.  Northern Valley is actively engaged in what the industry calls a "traffic pumping scheme."   Qwest has been an active party to several lawsuits involving similar schemes.  *In re Qwest Communications Corporation v. Farmers and Merchants Mutual Telephone Company*, File No. EB-07-MD-001 (Federal Communications Commission); *Qwest Communications Corporation v. Superior Telephone Cooperative et al*, Docket No. FCU-07-02 (Iowa Utilities Board); *Qwest Communications Corporation v. Superior Telephone Cooperative et al*, Case No. 4:07-CV-0078-JEG-RAW (United States District Court for the Southern District of Iowa); *Sancom, Inc. v. Qwest Communications Corporation*, Civ. 07-4147 (United States District Court for the District of South Dakota).  Substantial factual discovery has occurred in three of these cases.  The discovery uniformly shows that local exchange carriers, like Northern Valley, are attempting to charge long distance carriers, like Qwest, switched access charges for calls that are not subject to the state and federal tariffs.  Likewise, discovery in this case is necessary and will show that Northern Valley is trying to collect huge sums of money it is not entitled to collect under its own tariffs.

*1.    Factual Background: the Access Charge Regime.*

Since the break up of AT&T in 1984, long distance carriers, also called "interexchange carriers" or "IXCs," have paid local exchange carriers ("LECs") switched access charges to originate calls from and terminate calls to the LEC's end-user customers.  "Access charges are the means whereby local telephone companies recover from [long distance companies] their share of the cost of the local plant that is used in the origination and termination of interstate

2

calls." *Ohio Bell Tel. Co. v. FCC*, 949 F.2d 864, 868 (6th Cir. 1991) (quoting *National Assoc. of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095, 1103-05 (D.C. Cir 1984)).

Switched access charges for large LECs, like Verizon, are set at approximately ½ cent per minute, by tariffs filed with the Federal Communications Commission ("FCC") (for interstate calls) and state commissions (for intrastate calls).  **See Declaration of Lisa Hensley Eckert ("Hensley Eckert Dec.")** at ¶3.  However, switched access charges of rural carriers, as Northern Valley purports to be, are much higher.  Northern Valley charges 4.3 cents per minute for interstate calls and 12.25 cents per minute on intrastate calls.  *Id*. at ¶4.  Rural LECs charge higher access rates premised on the notion that the volume of traffic to and from their end-users will be modest because they serve very small communities, and because they require a subsidy to serve relatively few residents spread out across a large geographic area.  *Id*. at ¶ 5.

### 2.    *Traffic Pumping Abuse of the Access Charge Regime.*

Traffic pumping LECs, like Northern Valley, abuse the access charge regime by grossly inflating the traffic being delivered to them, and then compound this already very serious issue by charging IXCs switched access fees on calls that are not subject to those fees.  As to each traffic pumping LEC, the scheme has several common themes, with case-by-case factual variations on those themes.  Each LEC, including Northern Valley, entered into business relationships with so-called "Free Calling Service Companies" ("FCSCs") in which the LEC assigns telephone numbers to the FCSCs.  **See Hensley Eckert Dec.** at ¶6.  Northern Valley assigned telephone numbers to several FCSCs, including Global Conference Partners, TeleJunction, VAPPs and Eagle Teleconferencing.  *Id.* at ¶7.  In addition, Northern Valley has relationships with FCSCs that operate websites such as: (a) www.octopuscity.com, (b) www.highspeedconferencing.com, (c) www.yugma.com, and (d) www.easyconference.com.  *Id*.

3

On websites, these FCSCs offer "free" conference calling, "free" chat line service, and "free" international calling, using the South Dakota telephone numbers that the LEC assigned to the FCSC. *See* **Hensley Eckert Dec.** at ¶8. People then make calls (generally, long distance calls) to those telephone numbers to obtain the "free" services. Once dialed, the calls do not connect to one of Northern Valley's end-users; instead, the calls connect to a computer, router or conference bridge utilized by the FCSC. *Id*. Northern Valley bills the long distance carrier (such as Qwest) of the person who called the South Dakota telephone number, for terminating switched access. *Id*. Northern Valley then kicks back a portion of those switched access charges to the FCSC. *Id*. Indeed, in each case known to date, the LEC does not pay these kickbacks until the long distance carrier pays the subject access charges. *Id*. In sum, these purported "free" services are anything but. In reality, long distance carriers subsidize their very existence, and in the process are bilked by Northern Valley of millions of dollars in improper charges.

**B.    Northern Valley is Charging Qwest for Calls that Are Not Subject to Switched Access Charges.**

Northern Valley's highly generic complaint does not describe the nature of the traffic that underlies the charges it seeks to collect. *See, e.g.,* Complaint at ¶¶6, 8. Northern Valley alleges that it "provides telephone and other services through wires to the homes and businesses of its customers. Plaintiff also provides originating and terminating access services to long distance companies ... [to] connect to the users' telephones." *Id*. at ¶6. Northern Valley then concludes that it "billed [Qwest]... in accordance with the applicable rates set forth in Plaintiff's tariffs filed with the Federal Communications Commission and the South Dakota Public Utilities Commission." *Id*. at ¶9.

Northern Valley's access tariffs, however, do not apply to all traffic. For example, Northern Valley's interstate access tariff states:

4

> Switched Access Service… provides a two-point communications path between a customer [IXC] designated premises and ***an end-user premises***…. Switched Access Service provides for the ability to originate calls from an end-user premises to a customer designated premises, and to ***terminate*** calls from a customer designated premises to ***an end-user's premises***…

*See* **Hensley Eckert Dec.,** ***Attachment A*** at § 5.1 (emphasis added). *See also* ***Id., Attachment C*** at § 6.1 (Northern Valley's intrastate access tariff). Thus, for terminating switched access charges to apply, Northern Valley must (among other things) terminate traffic to (a) an end-user, at (b) an end-user's premises, and (c) within their local calling area. In cases just like this one, Qwest through discovery has established facts showing that traffic pumping LECs like Northern Valley have failed to meet each of these requirements.

### 1. The "End-User" Requirement for Switched Access Charges.

An "end-user" is a person who purchases local exchange services from the LEC. Northern Valley's local exchange catalog (a form of tariff), filed with the South Dakota Public Utilities Commission, defines a local customer as one who "contracts for telephone service… and is responsible for the payment of charges and compliance with the rules and regulations of the company."[1] *See* **Hensley Eckert Dec.,** ***Attachment B*** at Definitions. The same catalog also requires that Northern Valley submit monthly bills, and local customers pay these monthly bills. *Id.* at Pt. II(K)(1)(a, b). In contrast to an end user customer relationship, in traffic pumping cases it is the norm for the LEC to enter into a contract with FCSCs and agree to provide service to them at no charge. In many circumstances, there is a clear business relationship, but no indicia of a customer relationship. *See* **Hensley Eckert Dec.** at ¶¶9-10. For example, the LECs:

- Do not report the lines to the FCSCs as end user access lines on FCC forms;

---

[1] For example, Northern Valley's local catalog also requires Northern Valley to bill a $7.83 "Network Access Charge" to all multiline business customers. In other cases, traffic pumping LECs did not impose mandatory charges such as these on their FCSC partners.

- Do not input the FCSCs into their billing system;

- Do not issue invoices to the FCSCs and do not get paid by the FCSCs;

- Do not list the telephone numbers assigned to FCSCs in their directories;

- Do not charge the FCSCs for unlisted numbers; and

- Do not list the telephone numbers assigned to the FCSCs in the 911 database.

*Id.* at ¶9.

In an effort to overcome these clear problems, some LECs have forged and backdated invoices and contracts to make it appear that the FCSCs were their local customers. ***See* Hensley Eckert Dec.** at ¶11. In an FCC proceeding, these LECs were caught red-handed manufacturing this evidence and the FCC is in the process of reconsidering a decision as a result. *Id*. Thus, the question of whether Northern Valley's FCSCs are end-users requires extensive discovery.

2. *The "End-User Premises" Requirement for Switched Access Charges.*

Qwest expects Northern Valley will have great difficulty proving the calls were delivered to an end-user's "*premises*" as well. Northern Valley's interstate tariff defines "premises" as "a building or buildings on continuous property." ***See* Hensley Eckert Dec., *Attachment A*** at § 2.6. The local tariff defines "customer-premise equipment" as equipment "located on the customer's premise owned by the customer or owned by the telephone utility and … leased to the customer." ***See* Hensley Eckert Dec., *Attachment B*** at Definitions. In other traffic pumping cases, FCSCs did not have a building or location of their own; instead, the traffic pumping LECs let the FCSCs place equipment in the LECs' own buildings free of charge. In some circumstances, the traffic pumping LECs even purchased the conference equipment and allowed FCSCs to use it free of charge. Under any set of these facts, no calls delivered to FCSCs would meet the "end-user premises" standard.

Moreover, Northern Valley's local exchange tariff states that local exchange "customers will at their expense… [p]rovide power to operate" their customer-premise equipment. *See id., Attachment B* at Pt. VII(C)(1)(a). To the extent Northern Valley is not billing the FCSCs for power – a fact that is uniformly true in other jurisdictions – once again it shows the FCSCs are not end-users, and calls delivered to their equipment do not satisfy the requirement of termination to End-User Premises.

### 3. *The Local Exchange Area Requirement for Switched Access Charges.*

Finally, switched access charges cannot be assessed unless the calls terminate in Northern Valley's local exchange. Northern Valley is a competitive local exchange carrier (CLEC), and is wholly owned by James Valley Cooperative Telephone Company of Groton, an incumbent local exchange carrier (ILEC) in Groton, South Dakota. **See Hensley Eckert Dec.** at ¶17. A non-proprietary website from TelcoData indicates that Northern Valley has two listed switches, one in Redfield, South Dakota and one in Aberdeen, South Dakota. *Id.* at ¶18. Published information suggests they are both "remote" switches. *Id.* The switch information available in this non-proprietary site indicates that at least one of these, the Aberdeen site, has a piece of equipment called the Siemens EWSD remote digital line unit. The phone numbers assigned to that remote appear to be the numbers billed for traffic going to at least one FCSC. This equipment has a limited amount of capacity available into it, which is well below the capacity known to be essential for at least one of the FCSCs involved in this scheme. *Id.* If true, this means the subject traffic is actually being routed to or through James Valley's switch, which is located in a completely different local exchange. Another CLEC, Omnitel Communications in Iowa, was confronted with this exact scenario. **See Hensley Eckert Dec.** at ¶19. Instead of terminating the traffic within its own local exchange area, Omnitel had an affiliated ILEC from

another area terminate the traffic, and Omnitel billed the long distance carriers wrongfully claiming it had terminated the traffic. *Id*.

Moreover, Qwest has verified that one of the FCSCs partnering with Northern Valley is involved in international calling. *See id.* at ¶20. In these circumstances, calls are made to a South Dakota number assigned to Northern Valley, and the call is forwarded to an international location. The FCC "has generally used an 'end-to-end' analysis in determining where a call terminates." *In re Qwest Communications Corp. v. Farmers and Merchants Mutual Tel. Co.*, File No. EB-07-MD-001 at ¶32 (rel. Oct. 2, 2007) (citing *Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000)). Calls routed through South Dakota for international destinations do not terminate in South Dakota, but in the location where they are ultimately delivered. Thus, whether Northern Valley's terminates the subject calls in the local exchange area is another issue that must be addressed through discovery.

In sum, this case presents a series of factual questions that can only be addressed through substantial discovery. None of the known witnesses with whom Qwest is going to be seeking discovery are located in New York. Indeed, there is no logical nexus whatsoever to this District.

## C.    Northern Valley's Decision to File the Lawsuit in This District is Based Purely on Forum-Shopping.

### 1.    *Northern Valley Filed a Related Action in the South Dakota District Court.*

Northern Valley's complaints in this Court are not its first foray in litigating traffic pumping charges. Northern Valley already has a related case pending in the South Dakota District Court against MCI Communications. *Northern Valley Communications, L.L.C. v. MCI Communications Services, Inc.,* Case No. 07- 1016, 07-4106 (C.J. Schreier). **See Hensley Eckert Dec. *at Attachment E*.** That court recently denied Northern Valley's motion to dismiss Verizon's counterclaims. *N. Valley Communs., LLC v. MCI Commun. Servs.,* 2008 U.S. Dist.

LEXIS 49484 (D.S.D. June 26, 2008), a copy of which is attached as ***Exhibit 1.***  It is obvious that Northern Valley hopes to avoid this decision by filing this action in a different forum.

2. ***Northern Valley Hopes to Take Advantage of a Decision by Judge Pauley.***

On July 24, 2008, the Honorable Judge William H. Pauley issued a decision in a traffic pumping case, and dismissed AT&T's counterclaims distinguishing the South Dakota decisions. *All American Telephone Company, Inc., v. AT&T Corp.,* 2008 U.S. Dist. LEXIS 56277 (S.D.N.Y July 24, 2008).  AT&T's counterclaims were submitted before the IXCs were aware of the extent of the traffic pumping LECs' misconduct.  As a result, Judge Pauley gave AT&T an opportunity to replead its counterclaims, which AT&T has done.

Shortly after Judge Pauley's ruling, and instead of filing this case in South Dakota where it belongs and moving to consolidate with its related action against MCI, Northern Valley filed three separate lawsuits in this District – this case against Qwest, one against AT&T (Case No. 08-6798), and another against XO Communications (Case No. 08-6800).  Northern Valley thus hoped to avoid the South Dakota decisions affirming counterclaims by Qwest and Verizon, and to use a decision from this District that was premised on a less than complete record.  This is evident by Northern Valley's request at the filing of this action to refer the matter to Judge Pauley as a "related" case.  ***See Declaration of Charles W. Steese ("Steese Dec.") at Attachment A*** (Civil Complaint Cover Sheet in this action).  Judge Pauley rejected that request, finding that this case was not related.  Dkt. event, Aug. 11, 2008, entered August 20, 2008.

3. ***Qwest is Already a Party to Another Traffic Pumping Case in South Dakota.***

In addition, Qwest is the defendant-counterclaimant in another traffic pumping case in the South Dakota District Court.  *Sancom, Inc. v. Qwest Communications Corporation*, Case No. 07-4147 (C.J. Schreier).  This case is also assigned to the Honorable Chief Judge Karen E.

Schreier, the same judge who rejected Northern Valley's Motion to Dismiss in the *Verizon* case. Sancom brought the same type of claims as Northern Valley has brought here. *See* **Hensley Eckert Dec.** at ***Attachment F.*** Qwest brought counterclaims, asserting Sancom's traffic pumping is unlawful under federal and South Dakota law. The South Dakota District Court denied Sancom's motion to dismiss Qwest's counterclaims as well. *Sancom, Inc. v. Qwest Communications Corp.,* 2008 U.S. Dist. LEXIS 49491 (D.S.D. June 26, 2008), a copy of which is attached as ***Exhibit 2***. Further, the South Dakota District Court has entered a scheduling order permitting discovery. Thus, the South Dakota District Court is well positioned to address this case promptly. Qwest asks the Court to transfer this matter to that district.

II.  **ARGUMENT: SOUTH DAKOTA IS THE MORE CONVENIENT AND FAIR FORUM FOR THIS ACTION.**

To avoid waste of time and resources, Qwest moves to transfer this action prior to filing its Rule 12 responsive pleading.  17-111 *Moore's Federal Practice - Civil* § 111.17 (when grounds for transfer are known at beginning, Section 1404(a) motion to transfer should be filed before or with the responsive pleading); *Montgomery v. TAP Enters.,* 2007 U.S. Dist. LEXIS 12702 *10 n.7 (S.D.N.Y. Feb. 26, 2007) (Section 1404(a) motion may be filed at any time).  By first moving to transfer this action to the more convenient and appropriate forum of South Dakota District Court, Qwest does not waive any defenses or arguments for dismissal.

A.  **This Action Meets the Section 1404(a) Requirements: the Transferee District Is a Proper Venue, and the Transfer Is Warranted for Convenience and the Interest of Justice.**

Pursuant to Section 1404(a), the Court should transfer this action to the South Dakota District Court as the more appropriate forum for convenience and the interest of justice.  Section 1404(a) provides:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Section 1404(a) contains two elements: (1) that the transferee district be one where the action "might have been brought," and (2) that the transfer is warranted for convenience and the interest of justice.  *Walker v. Jon Renau Collection, Inc.,* 423 F. Supp. 2d 115, 116-117 (S.D.N.Y. 2005); *Glass v. S&M NuTec, LLC,* 456 F. Supp. 2d 498, 501 (S.D.N.Y. 2006).  The Court has broad discretion to resolve such motions on "a case-by-case basis, with the goal of 'prevent[ing] the waste of time, energy and money and . . . protect[ing] litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Glass,* 456 F. Supp. 2d at 501 (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964) (superseded in part

on other issue by 28 U.S.C. § 1631)); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-107 (2nd Cir. 2006).

Here, the first element – venue authorized under Section 1391 – should not be in dispute. Section 1391 states that venue exists, in relevant part, in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(1), (2). For purposes of this statute, corporations (such as Qwest) "reside" in "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). In this instance, the South Dakota District Court is a proper venue under either Section 1391(b)(1) or (2). Under Section 1391(b)(1), the South Dakota District Court is a proper venue because Qwest does not dispute that at least for purposes of this action, it is subject to personal jurisdiction in South Dakota. *See, e.g., Hot Stuff Food Sys. v. Griffin Petroleum,* 891 F. Supp. 499, 502-503 (D.S.D. 1995) (personal jurisdiction analysis in South Dakota collapses into satisfying due process, consistent with traditional notions of fair play and substantial justice, based on sufficient contacts with the forum state). Section 1391(b)(2) likewise supports venue in South Dakota, as a "substantial part of the events or omissions giving rise to the claim occurred" in South Dakota. See *supra*, at 4-8. Indeed, Northern Valley should not dispute that the South Dakota District Court is a venue where the action "might have been brought," because Northern Valley has already sued another long distance provider (MCI) there, and is aware that Qwest is a party to another traffic pumping action there as well.

To determine the second element – convenience and interest of justice – courts generally consider a nonexclusive list of several private and public interest factors: (1) the plaintiff's choice

of forum; (2) the place where the operative facts occurred; (3) the convenience of the parties; (4) the convenience of witnesses; (5) the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the availability of process to compel attendance of unwilling witnesses; (8) the forum's familiarity with governing law; and (9) trial efficiency and the interests of justice, including court congestion and the desirability of the transferee state for deciding the dispute locally. *Walker*, 423 F. Supp. 2d at 117.[2]  *See also Earley v. BJ's Wholesale Club, Inc.,* 2007 U.S. Dist. LEXIS 40125 (S.D.N.Y. June 4, 2007) (essentially same list of factors); *D.H. Blair & Co.* 462 F.3d at 106-107 (listing seven of these factors as "[s]ome of" those factors to consider on Section 1404(a) motions).  Qwest addresses these factors in turn.

### B.    Northern Valley's Choice of Venue Bears the Hallmarks of Forum-Shopping; the Court Should Substantially Discount this Factor.

"While significant deference is normally accorded to the plaintiff's choice of forum, the 'plaintiff's choice of forum is given less weight where the case's operative facts have little connection with the chosen forum.'"  *Frame v. Whole Foods Market, Inc.,* 2007 U.S. Dist. LEXIS 72720, 12 (S.D.N.Y. Sept. 24, 2007) (quoting *UFH Endowment, Ltd. v. Nevada Manhattan Mining, Inc.,* 2000 U.S. Dist. LEXIS 14178, 2000 WL 1457320, at *5 (S.D.N.Y. 2000)).  *See also Blum v. Salomon*, 2006 U.S. Dist. LEXIS 94267 *13 (S.D.N.Y. Dec. 26, 2006) (quoting *Wechsler v. Macke Int'l Trade, Inc.,* 1999 U.S. Dist. LEXIS 19800, 1999 WL 1261251, at *9 (S.D.N.Y. Dec. 27, 1999) (tenuous connection between plaintiff's claims and the SDNY did not justify denying transfer)).  *Cf., Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-256 (1981)

---

[2]  Because Section 1404(a) requests are resolved on a case-by-case basis, the opinions within this Court vary to a slight degree in organizing these factors; in *Walker* the Court notes that court congestion, the desirability of local resolution, and the appropriateness of a forum when state law will govern are public interest factors to generally consider in addition to the above private interest factors.  *Walker,* 423 F. Supp. 2d at 117 n.2.  Other cases appear to consider these issues within the category of the interest of justice.  *See, e.g., Earley,* 2007 U.S. Dist. LEXIS 40125.  For simplicity's sake, Qwest addresses the "public interest" factors in discussing the interest of justice, *infra*.

(on *forum non conveniens* motion to dismiss, less deference given to plaintiff's choice of venue when it is not the plaintiff's home forum); *Walker*, 423 F. Supp. 2d at 118 (foreign plaintiff's choice of forum given less deference).  This Court explained its rationale in *Frame*:

> Plaintiff in this case is not a resident of New York and according to the allegations contained in the Complaint and Plaintiff's Declaration, New York has only an ancillary connection to this dispute. As Plaintiff herself alleges, Defendant's allegedly infringing conduct involving the use the 365 Brand Label occurs everywhere Defendant operates supermarkets, not just in New York. Furthermore, the alleged oral contract between Plaintiff and Defendant [was] allegedly formed in North Carolina. …  Plaintiff also does not dispute that any documents that would be relevant to her claims are located at Defendant's Texas headquarters. Accordingly, under these circumstances, the weight afforded Plaintiff's choice of forum is diminished.

*Frame,* 2007 U.S. Dist. LEXIS 72720 at 12-13.  Here, none of the known facts giving rise to this dispute occurred in New York.  The epicenter of the dispute is South Dakota.

Moreover, when the plaintiff's choice of venue shows that forum-shopping, not convenience, is the basis for the plaintiff's decision to bring suit in the forum, courts significantly decrease the weight given to this factor.

> [A] plaintiff's choice of forum may be guided by factors other than its own convenience, such as strategic advantages a certain forum may provide. *Cf. Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (listing improper forum shopping reasons in a forum non conveniens context).  For this reason, the consideration afforded to a plaintiff's choice of forum is usually diminished where, as here, the plaintiff has chosen a forum that is neither the district of its residence nor the district in which the cause of action arose.

*Liberty Mut. Fire Ins. v. Costco Wholesale Corp.,* 2007 U.S. Dist. LEXIS 63435, 6-10 (S.D.N.Y. Aug. 27, 2007) (ruling on Section 1404(a) motion).  The existence of a truly related lawsuit already filed elsewhere signals the plaintiff has shopped for its forum:

> Here, Price apparently decided to refile his action, which was initially brought in California, in order to avoid the immediate-appeal provision of California's anti-SLAPP statute. …. In light of Price's residence outside the Southern District of New York, and his apparent strategic refiling in this District, the Court accords no weight to Price's most recent choice of forum.

*Price v. Stossel,* 2008 U.S. Dist. LEXIS 45672, 23-24 (S.D.N.Y. June 4, 2008) (internal quotation marks and citations omitted).

Here, the Court should not only substantially discount the weight given to Northern Valley's choice of forum, but should give this factor no weight at all because there is little (or no) connection to the operative facts, ***and*** Northern Valley is obviously attempting to forum shop. First, there is little or no connection to the venue of this Court because it is evident from the Complaint that Northern Valley does not reside in New York (Complaint at ¶¶2, 4), and the operative facts have no apparent connection to New York. *See, e.g.,* Complaint at ¶¶6, 9, and *supra* at 4-8. Although discovery is necessary to determine where the conference/chat equipment of Northern Valley's FCSC partners are located, a LEC can only charge for switched access on calls terminated to an end user premises within Northern Valley's local exchange in South Dakota. *See supra*, at 7-8. In sum, the alleged services and conduct at issue for all intents and purposes took place entirely in South Dakota.

Second, Northern Valley's choice of SDNY is motivated by forum-shopping, not convenience. At the time Northern Valley filed this lawsuit, it already had a related action pending in the South Dakota District Court against MCI Communications. That court denied Northern Valley's motion to dismiss MCI's counterclaims. *N. Valley Communs., LLC v. MCI Commun. Servs.,* 2008 U.S. Dist. LEXIS 49484 (D.S.D. June 26, 2008). Northern Valley only filed its complaints in this Court in the (unwarranted) hope that it could get the matter referred to Judge Pauley, and use affirmatively his July 24, 2008 decision. However, Judge Pauley himself rejected the referral. The only true related case is pending in the South Dakota District Court against MCI.

Given that Northern Valley has chosen a venue that has little or no connection to the operative facts on the hope of "friendlier" treatment than traffic pumping has met with in South Dakota, the Court should give no weight to the Plaintiff's choice of venue in this case.

**C.      The Locus of Operative Facts: South Dakota Is Where Northern Valley Alleges it Provided the Services For Which It Seeks Payment.**

It is indisputable that the majority of operative facts giving rise to this action have taken place in South Dakota.  Northern Valley's switch, central office, and business office are all located in South Dakota.  *See* **Hensley Eckert Dec.** at ¶15.  Northern Valley's certificate to provide local telephone service was granted by, and is regulated by, the South Dakota Public Utilities Commission.  *Id*. at ¶16.  To the extent Northern Valley has any local customers (as opposed to FCSCs), they are required to be located within South Dakota.  *Supra*, 7-8.  Other than calls made by Qwest end users in New York (where Qwest's end users are approximately 6 per cent of its overall retail long distance customer base), it appears that no operative facts have occurred in New York.  **Hensley Eckert Dec.**  at ¶¶25-26.

**D.      Convenience of the Parties: South Dakota is More Convenient for Both Northern Valley and Qwest.**

For both parties, South Dakota is a more convenient location than the SDNY.  Qwest is headquartered in Colorado, and has substantial operations in South Dakota.  *See* **Hensley Eckert Dec.** at ¶¶22-23.  Northern Valley's office is in Aberdeen, South Dakota.  Complaint ¶2. Northern Valley already has counsel representing it in its related case pending in the South Dakota District Court.  **Hensley Eckert Dec.**  at ¶19.  Likewise, Qwest already has local counsel in the related *Sancom* action in the South Dakota District Court.  *Id.*  at ¶24.  Qwest's travel costs and expenditure of time for an action in the South Dakota District Court will be substantially less than for an action in this Court.  *See* **Steese Dec.** at ¶8.  Northern Valley should not dispute that

an action in South Dakota will likewise be significantly more convenient to it (in travel time and expenses, for instance) than proceeding before this Court.  *Cf., Iragorri v. United Techs. Corp.,* 274 F.3d 65, 71 (2nd Cir. 2001) (plaintiff's home forum is "presumed to be convenient").  These same facts also show that in this case, the "relative means of the parties" (*Walker,* 423 F. Supp. 2d at 117) is largely irrelevant because Qwest is requesting a transfer to the smaller entity's home forum.  The convenience of the parties clearly weighs in favor of transferring the action.

**E.**    **Convenience of Witnesses:  There Are No Witnesses Located in New York, and Northern Valley's Officers and Employees Live in South Dakota.**

"The convenience of the forum for witnesses 'is probably considered the single most important factor in the analysis of whether a transfer should be granted.' ... When weighing this factor, the Court considers the materiality, nature, and quality of each witness, in addition to the number of witnesses in each district."  *Liberty Mutual,* 2007 U.S. Dist. LEXIS 63435 at *8-9 (quoting *Schnabel v. Ramsey Quantitative Sys., Inc.,* 322 F. Supp. 2d 505, 516 (S.D.N.Y. 2004)). The South Dakota District Court is a far more convenient forum for witnesses.  This factor is important as Qwest intends to call as witnesses non-officer employees of Northern Valley whom it could not subpoena to this Court (Fed. R. Civ. P. 45(c)(3)(B)(iii) non-officers of party cannot be required by subpoena to travel more than 100 miles) and whom Northern Valley presumably would not voluntarily cause to travel to this Court.  These employees include Rick Stugelmayer, Northern Valley's Plant Operations and Sales Manager, Russ Claussen, Network Operations Manager, and Kristi Larson, Marketing Director.  ***See* Steese Dec.** at ¶3.  These are the types of employees who, in Qwest's experience, have the necessary detailed information about interactions with FCSCs and how calls are directed through the network.  *Id.*  All appear to be located in South Dakota.  *Id.*  Qwest is unaware of a single witness located within New York, let alone within 100 miles of this District.

F.      **Relative Ease of Access to Sources of Proof: Plaintiff's Office in South Dakota Contains a Substantial Amount of the Relevant Evidence.**

Northern Valley should not dispute that South Dakota offers better access to sources of proof than this District.  A substantial amount of the relevant evidence in this case will consist of documents in Northern Valley's office in South Dakota (without limitation, documents such as call detail records on the traffic in question; contracts and correspondence with FCSCs; documentation regarding its various network equipment; correspondence with others regarding traffic pumping, etc.) and personal knowledge of its officers and technical network employees.  In addition, Qwest expects it will request a physical inspection of Northern Valley's central offices and its parent (James Valley)'s offices as well.  *See* **Steese Dec.** at ¶6.  Because South Dakota is the location of Plaintiff's documents and witnesses with personal knowledge, and is significantly closer to most other sources of proof than those in this District, this factor weighs in favor of granting the request for transfer.

G.      **Forum's Familiarity With Governing Law: On Issues That Are Not Governed by Federal Law, South Dakota Law Will Apply.**

 "Federal courts have generally favored adjudication of a controversy by the court which sits in the state whose law will provide the rules of decision." *Earley,* 2007 U.S. Dist. LEXIS 40125 at *8 (internal quotation and citation omitted; citing *Royal Ins. Co. of Am. v. United States,* 998 F. Supp. 351, 355 (S.D.N.Y. 1998)).  *Cf.*, *Iragorri*, 274 F.3d at 74 ("There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in … law foreign to itself.").  In this case, Counts I, II, V, and VI of the Complaint involve state law issues to which South Dakota law will apply.  These claims also involve Northern Valley's South Dakota access tariff.  Moreover, all of the claims (except potentially

unjust enrichment) are impacted by Northern Valley's local services tariff. These tariffs were promulgated according to South Dakota laws and decisions of the South Dakota Commission. S.D. Codified Laws Ann. § 49-31-5 (1, 3, 5, 14). In addition, Qwest intends to state counterclaims against Northern Valley, some of which will be based on South Dakota law. *See* **Steese Dec.** at ¶7.

To determine which state's law applies to the above issues, the Court applies New York's choice of law rules. *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 832 (2nd Cir. 1994). "New York courts give 'controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.'" *Id.* (quoting *Intercontinental Mon. Corp. v. Performance Guar.,* 705 F. Supp. 144, 147 (S.D.N.Y. 1989), which in turn quoted *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972)). Under New York's analysis, South Dakota is plainly the state whose law will apply. South Dakota is the state in which (among other things) Plaintiff resides, has been certificated as a LEC by the South Dakota Commission, has pumped the traffic for which it seeks payment, and on information and belief, entered into contracts with its FCSC partners. *See, e.g.,* **Hensley Eckert Dec.** at ¶¶15-18. The South Dakota District Court has greater familiarity with South Dakota law, and therefore this factor weighs in favor of transfer.

### H.   Judicial Economy, Public Interest, and the Interest of Justice Favor Transferring this Action to South Dakota.

The last element for the Court to consider on Qwest's request for transfer – trial efficiency and the interest of justice – likewise weighs in favor of the transfer. This factor encompasses several issues related to judicial economy and public interest:

> Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be

imposed upon the people of a community which has no relation to the litigation. ***In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home.***

*Iragorri,* 274 F.3d at 74 (emphasis added; quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947), addressing *forum non conveniens* motion). In this case, there is a strong South Dakota public interest in the traffic pumping that South Dakota LECs such as Northern Valley have conducted. Traffic pumping is necessarily an abuse of their status as LECs certificated by the South Dakota Commission. Northern Valley has also requested a jury trial, and should not impose this duty on residents of New York instead of South Dakota. [3]

This factor also includes considering the judicial economy of having Northern Valley's related action against MCI heard in the same district as this action:

> ***'It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer.'*** *APA Excelsior III L.P. v. Premiere Techs., Inc.,* 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999) …. Litigating related claims in the same tribunal allows for more efficient pretrial discovery, avoids duplicitous litigation, prevents inconsistent results, and saves times and expense for both parties and witnesses. ...
>
> * * *
>
> Additionally, there is significant overlap in witnesses and documents between this action and the California actions. Transfer would serve the interests of justice and judicial economy by avoiding the need for parties to litigate and witnesses to testify in more than one forum.

---

[3] *Iragorri* also notes that relative docket congestion can be a factor in a *forum non conveniens* motion. Here, relative docket congestion appears to have no impact on average case disposition time, and Qwest therefore does not rely on it for this Motion. The average caseload per judge in the South Dakota District Court (331) is significantly less than the SDNY average (632), but the median disposition time for civil cases in the South Dakota District Court (10.5 months) is largely the same as in SDNY (9.8 months). *See,* http://www.uscourts.gov/cgi-bin/cmsd2007.pl (accessed August 20, 2008). Where the average case disposition time has not differed significantly, the Court has found such data to be of marginal relevance. *In re Connetics Sec. Litig.,* 2007 U.S. Dist. LEXIS 38480 *30-31 (S.D.N.Y. May 23, 2007); *Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb,* 2006 U.S. Dist. LEXIS 36018 (S.D.N.Y. June 5, 2006).

*Fuji Photo Film Co. v. Lexar Media, Inc.,* 415 F. Supp. 2d 370, 376-377 (S.D.N.Y. 2006) (emphasis added; granting motion to transfer). *Cf., In re AtheroGenics Sec. Litig.,* 2006 U.S. Dist. LEXIS 15786, *9 (S.D.N.Y. Mar. 31, 2006) (previously filed actions pending in defendant's home district make transfer especially appropriate).

Given South Dakota's strong public interest in the traffic pumping scheme that South Dakota LECs have caused to flourish in that state, the Plaintiff's already pending suit against MCI in South Dakota, and the fact that Qwest is already a defendant-counterclaimant in another traffic pumping action pending in the same South Dakota court, the interest of justice plainly weighs in favor of transferring this action (and the other Northern Valley actions) to Northern Valley's home forum, the South Dakota District Court.

### III.  CONCLUSION

Because Plaintiff's choice of forum in this case is entitled to little or no deference, and the other factors considered regarding convenience, interest of justice and fairness clearly weigh in favor of this action proceeding in the South Dakota District Court, the Court should grant Qwest's Motion to Transfer Venue pursuant to 28 U.S.C. Section 1404(a).

Dated:  September 2, 2008

Respectfully submitted,

By   /s/  Eric B. Epstein
Eric B. Epstein, Esq. (EBE8992)
Dorsey & Whitney LLP
250 Park Avenue
New York, NY
10177-1500
Telephone: (212) 415-9200
Facsimile:  (212) 953-7201
Email:  epstein.eric@dorsey.com

Charles W. Steese (pro hac vice application pending)
STEESE & EVANS, P.C.
6400 S. Fiddlers Green Circle, Suite 1820
Denver, Colorado 80111
Telephone: (720) 200-0676
Facsimile:  (720) 200-0679
Email:  csteese@s-elaw.com

Attorneys for Defendant Qwest Communications Corporation

# EXHIBIT 1

LEXSEE 2008 U.S. DIST. LEXIS 49484

**NORTHERN VALLEY COMMUNICATIONS, LLC, a South Dakota limited liability company, Plaintiff, vs. MCI COMMUNICATIONS SERVICES, INC., d/b/a Verizon Business Services, a Delaware corporation, Defendant, GLOBAL CONFERENCE PARTNERS, LLC, d/b/a Quality Conferencecall.com, Counterclaim Defendant. SANCOM, INC., a South Dakota corporation, Plaintiff, vs. MCI COMMUNICATIONS SERVICES, INC., d/b/a Verizon Business Services, a Delaware corporation, Defendant. FREECONFERENCING CORP., a Nevada Corporation, and CITRIX ONLINE LLC, a Delaware Limited Liability Company, Counterclaim Defendants.**

**CIV. 07-1016, CIV. 07-4106**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH DAKOTA, NORTHERN DIVISION**

*2008 U.S. Dist. LEXIS 49484*

**June 26, 2008, Decided
June 26, 2008, Filed**

**PRIOR HISTORY:** *N. Valley Communs., LLC v. MCI Communs. Servs., 2007 U.S. Dist. LEXIS 66168 (D.S.D., Sept. 5, 2007)*

**COUNSEL:** [*1] For Northern Valley Communications, LLC, a South Dakota Limited Liability Company, Plaintiff: James M. Cremer, LEAD ATTORNEY, Bantz, Gosch & Cremer, LLC, Aberdeen, SD; Michael B. Hazzard, Ross A. Buntrock, LEAD ATTORNEYS, Womble Carlyle Sandridge & Rice PLLC, Washington, DC.

For Sancom, Inc, a South Dakota corporation, Plaintiff: James M. Cremer, LEAD ATTORNEY, Bantz, Gosch & Cremer, LLC, Aberdeen, SD; Jeffrey D. Larson, LEAD ATTORNEY, Woonsocket, SD; Chris A. Nipe, Larson & Nipe, Mitchell, SD.

For MCI Communications Services, Inc., a Verizon Business Services, a Delaware corporation, Defendant: David A. Gerdes, LEAD ATTORNEY, May, Adam, Gerdes & Thompson, Pierre, SD; Joshua B. Simon, William H. Pratt, LEAD ATTORNEYS, Kirkland & Ellis, New York, NY.

For Global Conference Partners, LLC, doing business as Quality ConferenceCall.com, Counter Defendant: Helen E. Disenhaus, Mark James O'Connor, LEAD ATTORNEYS, Lampert & O'Connor PC, Washington, DC; Jeana L. Goosmann, LEAD ATTORNEY, Heidman Law Firm, Sioux City, IA; John C. Gray, LEAD ATTOR-NEY, Heidman, Redmond, Fredregill, Patterson, Plaza & Dykstra, Sioux City, IA.

For Sancom, Inc, A South Dakota corporation, Counter Defendant: Jeffrey D. Larson, [*2] LEAD ATTORNEY, Woonsocket, SD.

For FreeConferencing, Citrix Online LLC, Counter Defendants: Ronald A. Parsons, Jr., LEAD ATTORNEY, Johnson, Heidepriem, Janklow, Abdallah & Johnson, LLP, Sioux Falls, SD.

For MCI Communications Services, Inc., Verizon Business Services, a Delaware corporation, Counter Claimant: David A. Gerdes, LEAD ATTORNEY, May, Adam, Gerdes & Thompson, Pierre, SD; Joshua B. Simon, William H. Pratt, LEAD ATTORNEYS, Kirkland & Ellis, New York, NY.

For Northern Valley Communications, LLC, a South Dakota Limited Liability Company, Counter Defendant: James M. Cremer, LEAD ATTORNEY, Bantz, Gosch & Cremer, LLC, Aberdeen, SD; Michael B. Hazzard, Ross A. Buntrock, LEAD ATTORNEYS, Womble Carlyle Sandridge & Rice PLLC, Washington, DC.

**JUDGES:** KAREN E. SCHREIER, CHIEF JUDGE.

**OPINION BY:** KAREN E. SCHREIER

## OPINION

### ORDER

Plaintiffs, Northern Valley Communications and Sancom, Inc., each brought suit against MCI Communications Services, Inc., d/b/a Verizon Business Services (Verizon), seeking to obtain payment for services they allege they provided to Verizon. Their suits were consolidated by the court. Verizon filed a 13-count counterclaim against plaintiffs and also against Global Conference Partners, LLC, FreeConferencing [*3] Corp., and Citrix Online L.L.C. (collectively referred to as provider defendants). Plaintiffs and provider defendants move to dismiss the counterclaims. Verizon opposes the motions.

## FACTUAL BACKGROUND

Viewed in the light most favorable to the nonmoving party, and as is relevant to this order, there are two distinct types of telecommunications providers, local exchange carriers and interexchange carriers. Local exchange carriers provide the service and own the hardware that connects to individual customers in their local area. By contrast, interexchange carriers, commonly known as long distance carriers, own the hardware that connects local carriers, thus allowing an individual to place a call to another individual that is not within the same local network. Local exchange carriers charge fees to long distance carriers in exchange for allowing them access to their networks, and connecting them with local customers.

The rates charged for access services are determined by the published tariff rate, which is filed with and reviewed by the Federal Communications Commission (FCC). Because Northern Valley and Sancom are both South Dakota based, the tariffs are also subject to review by the South [*4] Dakota Public Utilities Commission (SDPUC).

Verizon began purchasing tariffed access services from Northern Valley in 2000 and from Sancom in 2005. Northern Valley alleges that Verizon unilaterally stopped paying it for access services on February 1, 2007. Sancom alleges that Verizon unilaterally stopped paying it for access services on June 1, 2007. Plaintiffs thereafter filed suit against Verizon, seeking to collect charges they allege are due under the applicable tariffs.

In its amended answer to each of plaintiff's complaints, Verizon asserts thirteen counterclaims based upon both federal and state law. Verizon alleges that Northern Valley and Global participated in an unlawful scheme to increase traffic, and in turn increase access fees billed to Verizon. Verizon alleges that Sancom participated in a similar scheme with FreeConferencing and Citrix.

The schemes alleged to be unlawful by Verizon relate to teleconferencing services operated by provider defendants. Provider defendants facilitated primarily free conference calling services for their users. Users were given a number to dial, which connected them to a conference call bridge. The conference call participants were then connected [*5] to each other at and by the bridge. In determining the localities in which to place its conference call bridges, Verizon alleges that provider defendants purposefully partnered with local exchanges like Northern Valley and Sancom. Because Northern Valley and Sancom are designated as rural competitive local exchange carriers (CLECs), they are eligible to file a higher tariff rate. The higher revenue gained by Northern Valley and Sancom as a result of the conference calling phone traffic was partly redistributed to provider defendants. Verizon alleges that this arrangement by plaintiffs and provider defendants, which it refers to as a "traffic pumping scheme," was a deliberate and illegal effort to increase traffic to plaintiffs' exchanges.

## MOTION TO DISMISS STANDARD

In considering a motion to dismiss a counterclaim, the court assumes all facts alleged in the counterclaim are true, construes the counterclaim liberally in the light most favorable to the claimant, and should dismiss only if "it appears beyond a doubt that the [claimant] can prove no set of facts which would entitle the [claimant] to relief." *Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994)*. "The issue is not whether a claimant [*6] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)*, overruled on other grounds by *Davis v. Scherer, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017, 82 L. Ed. 2d 139 (1984)*.

## DISCUSSION

Verizon responds to the complaints of both Northern Valley and Sancom with a set of thirteen counterclaims. Although the counterclaims are filed against both plaintiffs separately, they contain nearly identical allegations and the court will therefore analyze them together. Counterclaims 3, 8, and 13 also allege claims against provider defendants. In the motions to dismiss Verizon's counterclaims, plaintiffs and provider defendants argue that Verizon's claims are barred by the filed rate doctrine. Plaintiffs and provider defendants further argue that dismissal of the counterclaims is appropriate in light of the recently issued decision of the FCC in Qwest Communications Corp v. Farmers & Merchants Mutual Telephone Company, Mem Op. & Order, File No. EB-07-MD-001, [*7]

FCC 07-175 (Oct. 2, 2007). Plaintiffs and provider defendants also argue that Verizon has failed to state a claim with respect to each individual counterclaim. Global moves in the alternative to have the case transferred to the FCC pursuant to the primary jurisdiction doctrine.

## I. Filed Rate Doctrine

*Section 203(a)* of the Communications Act requires telecommunications carriers to file a tariff with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." *47 U.S.C. § 203(a)*. Telecommunications carriers cannot "charge, demand, collect, or receive a greater or less or different compensation" for services subject to tariffs. *47 U.S.C. § 203(c)*. These provisions are modeled after provisions contained in the Interstate Commerce Act, and therefore, courts have found that the filed rate doctrine applies to telecommunications carriers. *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 221-22, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998)*.

"'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be the law and to therefore conclusively and exclusively enumerate [*8] the rights and liabilities as between the carrier and the customer.' " *Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006)* (quoting *Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir. 2000)*) (alteration in original). "[T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of the rates; and (2) insure that regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004)*. The filed rate doctrine also prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff. See *Hill v. BellSouth Telecomm., Inc., 364 F.3d 1308, 1316 (11th Cir. 2004)*. The filed rate doctrine is equally applicable to tariffs set by state regulatory agencies. See *Teleconnect Co. v. US West Commc'ns, Inc., 508 N.W.2d 644, 647-48 (Iowa 1993)*.

Verizon argues that the filed rate doctrine is not applicable, in part, because it alleges that plaintiffs did not provide the services contemplated by the tariff. With respect to Northern Valley, [*9] Verizon alleges that the services were provided by Northern Valley's parent company James Valley, and therefore Northern Valley improperly billed Verizon for the provision of access services. With respect to both plaintiffs, Verizon alleges that the services that plaintiffs received and were billed for did not qualify as the services set forth in the tariffs.

Plaintiffs argue strenuously that the filed rate doctrine is a "harsh" and "strict" rule that cannot be avoided simply by alleging that the tariff does not apply. Docket 55 at 9. In Central Office Telephone, the Court explained:

> While the filed rate doctrine may seem harsh in some circumstances, its strict application is necessary to prevent carriers from intentionally misquoting rates to shippers as a means of offering them rebates or discounts, the very evil the filing requirement seeks to prevent. Regardless of the carrier's motive-whether it seeks to benefit or harm a particular customer-the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services. It is that antidiscriminatory policy which lies at the heart of the common-carrier section of the Communications Act.

*Central Office Telephone, 524 U.S. at 223.*

With [*10] respect to Verizon's contention that plaintiffs did not provide the services set forth in the tariff, the court does not find that this type of claim is barred by the filed rate doctrine. As discussed in *Central Office Telephone*, the purpose of the doctrine is to be antidiscriminatory, to prevent one customer from receiving a rate different than another. Verizon's claims are not challenging the validity of the rate, but rather it argues that the arrangement between plaintiffs and provider defendants results in the provision of services not covered by the tariff. In the context of a motion to dismiss, the court must assume the allegations of Verizon to be true, that it was billed for tariffed services that it did not receive. A ruling in Verizon's favor would not result in Verizon paying rates different from other entities who obtained services properly categorized under the tariff from plaintiffs. The court therefore finds that these allegations and claims related to these allegations are not barred by the filed rate doctrine.

Plaintiffs filed suit seeking to recover fees they allege are owed under the tariff. To recover for amounts charged pursuant to a tariff, "plaintiffs must demonstrate [*11] (1) that they operated under a federally filed tariff and (2) that they provided services to the customer pursuant to that tariff." *Advamtel LLC v. AT & T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000)*. Under this second element, plaintiffs must show they provided services pursuant to the tariff, which is the converse of what Verizon alleges in its counterclaims. The court finds that because this determination is appropriately made by the

fact-finder with respect to plaintiffs' claims, that further supports the court's finding that the allegations contained within the counterclaims, as discussed above, are not barred by the filed rate doctrine.

Although the filed rate doctrine does not act as a bar to Verizon's claims that it did not receive tariffed access services, the court does find that the filed rate doctrine acts as a bar to Verizon's assertions that the tariffs are "void abinitio" because plaintiffs are not rural CLECs. Plaintiffs have filed tariffs as rural CLECs, and Verizon's allegations are effectively a direct challenge to the validity of that rate. Further, there is no indication that plaintiffs' status has ever been questioned by the FCC. If the court were to invalidate [*12] the tariffs with respect to the services provided to Verizon, and subsequently apply a different tariff rate to those services, the result of that determination would be that other long distance carriers would pay a different rate than Verizon. This is exactly the discriminatory concern that the filed rate doctrine is meant to combat. See, e.g., *H.J. Inc. v. Northwestern Bell Tele. Co., 954 F.2d 485, 489-92 (8th Cir. 1992)*. Accordingly, to the extent that Verizon alleges that plaintiffs' tariffs are void because plaintiffs are not "rural CLECs," that argument is dismissed by this court.

## II. Farmers

Plaintiffs and provider defendants also argue that Verizon's counterclaims are foreclosed by the FCC's recent decision in Farmers. Verizon does not dispute that the FCC's ruling in Farmers should be given deference by this court pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. [1] In Farmers, the FCC faced a factual situation similar to the one present in this case. Qwest, an interexchange carrier similar to Verizon, alleged that Farmers, a local exchange carrier similar to Northern Valley and Sancom, violated [*13] the Communications Act. Farmers, P 1. Qwest alleged that Farmers undertook a deliberate scheme to increase traffic to its network through agreements with conference calling companies. Id.

> 1   The court notes that the FCC granted an order for reconsideration of the Farmer decision in January of 2008 to allow further development of the factual record. See Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co., Order on Reconsideration, File No. EB-07-MD-001, FCC 08-29 (Jan. 29, 2008).

A significant difference between Farmers and the plaintiffs in this case, however, is that Farmers was an incumbent local exchange carrier rather than a competitive local exchange carrier. As an incumbent LEC; the tariff rate for Farmers was determined by the rate of re-turn it achieved in previous time periods. The essence of Qwest's complaint was that after establishing the tariff rate during a period of low traffic, Farmers dramatically increased traffic through agreements with the conference calling companies, thus earning an unreasonably high rate of return.

The FCC determined that during the period in question, Farmers had vastly exceeded its prescribed rate of return. Id. at P 25. Despite [*14] this finding, the FCC found that Farmers, although it "manipulated the Commission's rules to achieve a result unintended by the rules," it did not act in an unlawful manner. Id. The FCC found that the conference calling companies were appropriately identified by Farmers as end users under the relevant tariff. Id. at P 35. The FCC further found that Farmers' payment of "marketing fees" to the conference calling companies did not affect the status of those companies as customers of Farmers. Id. at P 38.

Although the issues that confronted the FCC in Farmers are similar to those at issue in this case, the court does not find that the FCC's findings are dispositive at this stage of the litigation. In Farmers, both parties had the opportunity to conduct discovery, and the FCC relied on the developed record in determining that Farmers had acted lawfully under the tariff. See id., PP 30-39.

Further, the claims made by Verizon here differ in some ways from the claims made by Qwest in Farmers. Verizon argues that pursuant to the tariff at issue in this case, plaintiffs are required to provide a "two-point communication path" to the end user's premises." With respect to its claim against Northern [*15] Valley, Verizon alleges that Northern Valley's parent company James Valley actually provided some or all of the services, and therefore Northern Valley violated the tariff by not providing a "two-point communication path."

Additionally, Verizon alleges that the tariffs of both Northern Valley and Sancom, which require the provision of services to the "end user's premises," define "end user" as a "customer that is not a carrier." Verizon alleges that provider defendants, by offering conference calling and other services, qualify as "carriers" under plaintiffs' tariffs.

Finally, Verizon alleges that provider defendants are not "customers" of Northern Valley and Sancom as defined under the tariffs because they do not "subscribe" to any services offered under plaintiffs' tariffs. Verizon acknowledges that a similar argument was made by Qwest before the FCC in Farmers and rejected. But Verizon specifically alleges in its complaint that the providers "do not" subscribe to any services under plaintiffs' tariffs. At this stage of the litigation, without a developed record regarding the relationship between provider defendants and plaintiffs, the court must accept Verizon's allegations

as true [*16] and therefore the situation faced by the FCC in *Farmers* is distinguishable on this ground as well. For these reasons, the court finds that the FCC's ruling in *Farmers* does not mandate dismissal of Verizon's counterclaims.

## III. Individual Claims

### A. Fraudulent and Negligent Misrepresentation

Amended counterclaim 1 alleges that plaintiffs are liable for fraudulent and negligent misrepresentation. Verizon alleges that plaintiffs billed Verizon for services plaintiffs did not provide and at unlawful tariff rates. In plaintiffs' motion to dismiss, they assert that this claim is barred by the filed rate doctrine.

To state a claim for fraudulent or negligent misrepresentation Verizon must show that plaintiffs: (1) made a representation of a statement of fact which they knew to be untrue, (2) intended the statement to deceive Verizon and for Verizon to act on the statement, and (3) that Verizon did in fact rely on it to its detriment. *Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991)*. To state a claim for negligent misrepresentation, Verizon must allege that "in the course of business or any other transaction in which an individual has a pecuniary interest, he or she supplies false information for [*17] the guidance of others in their business transaction, without exercising reasonable care in obtaining or communicating the information." *Bayer v. PAL Newcomb Partners, 2002 SD 40, 643 N.W.2d 409, 412 (S.D. 2002)*.

As discussed above, the court finds that the filed rate doctrine does not bar Verizon's unique allegation that it did not receive services under the tariff. This is a different situation from that faced by the court in Central Office Telephone, where there was no dispute over whether the tariffed service was actually provided, but rather over the terms of the agreement to provide the services. *Central Office Telephone, 524 U.S. at 224-25*. Assuming all allegations contained in the counterclaim are true, the court finds that Verizon has sufficiently alleged a claim of fraudulent or negligent misrepresentation. Plaintiffs' motion to dismiss that claim is therefore denied.

### B. Violation of South Dakota Deceptive Trade Practices Act

Amended counterclaim 2 alleges a violation of *SDCL 37-24-6(1)*, which provides:

> It is a deceptive act or practice for any person to . . . [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation [*18] or

> to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby . . .

Any person who is adversely affected by a practice prohibited by *SDCL 37-24-6(1)* can bring a civil action. Verizon alleges that plaintiffs billed it for services plaintiffs did not provide. Plaintiffs argue that this claim is barred by the filed rate doctrine because, like the federal claims discussed above, the filed rate doctrine cannot be expanded by state statutory claims.

The court finds that this claim is outside the scope of the filed rate doctrine because it alleges that plaintiffs did not actually provide the tariffed services for which Verizon was billed. Accordingly, assuming the allegations in the counterclaim to be true, the court finds that Verizon has sufficiently alleged a claim for a violation of the South Dakota Deceptive Trade Practices Act and plaintiffs' motion to dismiss that claim is denied.

### C. Civil Conspiracy

Amended counterclaim 3 alleges that plaintiffs and provider defendants conspired to artificially increase the volume of long distance traffic that was [*19] routed to plaintiffs' networks in order to allow plaintiffs to charge an unlawful rate for services they did not perform. Under South Dakota law, to prove a prima facie case of civil conspiracy, the plaintiff must prove the following five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *Setliff v. Akins, 2000 SD 124, 616 N.W.2d 878, 889 (S.D. 2000)*.

Plaintiffs and provider defendants argue that Verizon has not properly alleged a claim for civil conspiracy because it has not alleged any unlawful acts. A review of the counterclaim, however, demonstrates that Verizon alleges that plaintiffs and provider defendants were involved in an illegal scheme that resulted in charging Verizon for services not provided for in the applicable tariffs. As discussed in more detail above with respect to the *Farmers* decision, plaintiffs' arguments that the scheme was lawful based upon the FCC ruling are not dispositive at this stage of the litigation. Assuming all facts alleged in the complaint to be true, and [*20] construing the counterclaim liberally in the light most favorable to Verizon, the court finds that Verizon has alleged sufficient facts to state a claim under the third amended

counterclaim. Plaintiffs' motion to dismiss is therefore denied.

**D. Violation of Federal Tariff**

Amended counterclaim 4 alleges that plaintiffs acted in violation of federal law, namely *47 U.S.C. § 203*, by billing Verizon for services that plaintiffs did not provide and at unlawful rates. Plaintiffs argue that this claim is barred by the filed rate doctrine because Verizon is asking the court to void plaintiffs' tariffs and apply a different rate. Viewing the counterclaim in the light most favorable to Verizon, the court finds that Verizon has successfully alleged that plaintiffs billed Verizon for tariffed services that were not provided and therefore Verizon has made allegations sufficient to state a claim for a violation of *47 U.S.C. § 203(c)*. Accordingly, plaintiffs' motion to dismiss is denied.

**E. Breach of South Dakota Communications Act**

Amended counterclaim 5 alleges that plaintiffs violated South Dakota law by charging and collecting compensation for services they did not provide in violation of *SDCL 49-31-12.2.* [*21] For the same reasons discussed with regard to counterclaim 4, plaintiffs' motion to dismiss the counterclaim is denied.

**F. Violation of *47 U.S.C. § 203(c)***

Amended counterclaim 6 alleges that plaintiffs violated *47 U.S.C. § 201(b)*, which prohibits "unjust or unreasonable rates or practices" by a communications carrier. Verizon alleges that plaintiffs engaged in the following "unjust and unreasonable practices:" conspiring to artificially increase long distance traffic, fraudulently billing Verizon, and charging an unlawful tariff rate. Viewing the counterclaim in the light most favorable to Verizon, the court finds that Verizon has successfully alleged a violation of *47 U.S.C. § 201(b)*. Accordingly, plaintiffs' motion to dismiss is denied.

**G. Unjust Enrichment**

Amended counterclaim 7 alleges a claim for unjust enrichment against plaintiffs. "Unjust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.' " *Hofeldt v. Mehling, 2003 SD 25, 658 N.W.2d 783, 788 (S.D. 2003)* (quoting *Parker v. Western Dakota Insurors, Inc., 2000 SD 14, 605 N.W.2d 181, 187 (S.D. 2000))*. Verizon alleges that plaintiffs received a [*22] benefit for services they did not provide and for which they charged an unlawful rate.

Plaintiffs argue that because an express contract exists between the parties, the equitable remedy of unjust enrichment cannot be relied upon by Verizon. In support

of this argument, plaintiffs cite *Thurston v. Cedric Sanders Co., 80 S.D. 426, 125 N.W.2d 496, 498 (S.D. 1963)*, which held "[w]here there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or a suit on *quantum meruit."* In this case, however, Verizon has alleged that the contract does not cover the services provided by plaintiffs. Assuming the facts alleged by Verizon to be true, Verizon has successfully alleged that it is entitled to recover damages under a theory of unjust enrichment. Accordingly, plaintiffs' motion to dismiss the counterclaim is denied.

**H. Aiding and Abetting**

Amended counterclaim 8 alleges that provider defendants aided and abetted plaintiffs in committing tortious conduct. Provider defendants assert that there is not a civil cause of action for aiding and abetting under South Dakota law. But, in *Chem-Age Industries, Inc. v. Glover, 2002 SD 122, 652 N.W.2d 756, 773 (S.D. 2007)*, [*23] the South Dakota Supreme Court cited with approval *Restatement (Second) of Torts § 876(b)* in finding that South Dakota law recognizes a claim for aiding and abetting the breach of a fiduciary duty. The Restatement provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

*Restatement (Second) of Torts, § 876(b)* (1977).

For the same reasons discussed with respect to Verizon's counterclaim for civil conspiracy, the court finds that Verizon has alleged sufficient facts to survive provider defendants' motion to dismiss Verizon's claim for aiding and abetting and accordingly that motion is denied.

**I. Breach of Contract**

Amended counterclaim 9 alleges a claim of breach of contract against plaintiffs, which Verizon asserts as an alternative to its claim of unjust enrichment alleged in counterclaim 7. If the court finds that plaintiffs' tariffs give rise to a contractual relationship, Verizon alleges that plaintiffs are liable for breach of contract because plaintiffs fraudulently billed Verizon [*24] for services they did not provide. Plaintiffs assert that this claim is barred by the filed rate doctrine. As discussed above, to the extent Verizon alleges that plaintiffs charged Verizon

for services not covered by the tariff, and the tariff still creates a valid contractual relationship, Verizon's individual claim is not barred by the filed rate doctrine. The court finds that Verizon has alleged sufficient facts that, if true, give rise to its claim for breach of contract. Accordingly, plaintiffs' motion to dismiss is denied.

### J. Declaratory Relief

Amended counterclaim 11 seeks a judicial determination that Verizon should not be required to pay the invoiced fees for services provided in connection with calls generated by provider defendants. Verizon also seeks declaratory judgment that the tariffed access rates charged by plaintiffs are unlawful. Plaintiffs argue that this attempt at relief is barred by the filed rate doctrine.

As discussed above, Verizon's allegations that it did not receive services under the tariff must be assumed to be true for purposes of a motion to dismiss. If Verizon did not receive tariffed services, it has a valid claim for declaratory relief with respect [*25] to plaintiffs' invoices charging Verizon for those services. Therefore, plaintiffs' motion to dismiss is denied.

### K. Injunctive Relief

Amended counterclaim 12 seeks injunctive relief against plaintiffs. For the same reasons discussed with respect to amended counterclaim 11, plaintiffs' motion to dismiss the counterclaim is denied.

### L. Tortious Interference

Amended counterclaim 13 alleges that provider defendants tortiously interfered with an otherwise valid business relationship between Verizon and plaintiffs. Verizon alleges that provider defendants initiated the "traffic pumping" scheme to artificially increase the phone traffic handled by plaintiffs and caused plaintiffs to fraudulently bill Verizon for access services.

To prove a claim for tortious interference, Verizon must show: (1) the existence of a valid business relationship or expectancy between Verizon and plaintiffs; (2) knowledge by provider defendants of the relationship or expectancy; (3) an intentional unjustified act of interference on the part of provider defendants; (4) proof that the interference cause the harm sustained; and (5) damages. See *St. Onge Livestock Co. v. Curtis, 2002 SD 102, 650 N.W.2d 537, 541 (S.D. 2002).*

Provider defendants [*26] argue that Verizon did not have a valid expectancy in the stability of the usage of plaintiffs' networks, which could wax or wane depending on a number of circumstances outside of the control of any party. Provider defendants further argue that Verizon cannot demonstrate that their acts were "unjustified"

under the third element. Despite the contentions of provider defendants, Verizon has alleged sufficient facts to survive a motion to dismiss. Assuming all allegations in the counterclaim to be true, provider defendants knowingly initiated a "traffic pumping" scheme which generated traffic which was not covered by the applicable tariff agreement between the parties in an attempt to cause plaintiffs to fraudulently bill Verizon. These allegations are sufficient to state a claim for tortious interference. Accordingly, provider defendants' motion to dismiss this counterclaim is denied.

### IV. Primary Jurisdiction

In the alternative, Global argues that if the court does not dismiss the amended counterclaims, it should transfer the amended counterclaims to the FCC while retaining plaintiffs' collection action. "The primary jurisdiction doctrine is premised on a desire for uniform outcomes and [*27] on the inherent advantage in allowing an agency . . . to apply its expert judgment to the issues in dispute." *Total Telecomm. Services, Inc. v. American Tel. & Tel. Co., 919 F. Supp. 472 (D. D.C. 1996).*

Courts generally consider four factors in determining whether to invoke the primary jurisdiction doctrine:

(1) whether the question at issue is within the conventional experience of judges; (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*American Tel & Tel Co. v. MCI Commc'ns Corp., 837 F. Supp. 13, 16 (D.D.C. 1993).*

Under the circumstances of this case, the court finds that the primary jurisdiction doctrine does not require this court to transfer jurisdiction over the proceedings to the FCC. Verizon's counterclaims present issues that lie within the experience of this court. Further, the guidance provided by the FCC in Farmers will minimize the risk of inconsistent rulings when this court has a developed record before it. The court also finds that concerns of judicial efficiency reinforce [*28] this determination. Because the court must rule on plaintiffs' collection action, it is more efficient to consider Verizon's counterclaims, especially in light of the fact that there appears to be a substantial overlap in the issues relevant the claims of each party.

2008 U.S. Dist. LEXIS 49484, *

Based on the foregoing, it is hereby

ORDERED that plaintiffs' motion to dismiss the amended counterclaims (Docket 43) is denied.

IT IS FURTHER ORDERED that provider defendants' motions to dismiss the amended counterclaims (Dockets 45, 51) are denied.

IT IS FURTHER ORDERED that plaintiffs' and provider defendants' motions for protective orders (Dockets 70, 72) are denied as moot.

Dated June 26, 2008.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER

CHIEF JUDGE

# EXHIBIT 2

1 of 1 DOCUMENT

**SANCOM, INC., a South Dakota corporation, Plaintiff, vs. QWEST COMMUNI-
CATIONS CORPORATION, a Delaware corporation, Defendant.**

**CIV. 07-4147-KES**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH DA-
KOTA, SOUTHERN DIVISION**

*2008 U.S. Dist. LEXIS 49491*

**June 26, 2008, Decided
June 26, 2008, Filed**

COUNSEL: [*1] For Sancom, Inc., a South Dakota Corporation, Plaintiff: Chris A. Nipe, LEAD ATTORNEY, Larson & Nipe, Mitchell, SD; Jeffrey D. Larson, LEAD ATTORNEY, Woonsocket, SD; Michael B. Hazzard, Ross A. Buntrock, LEAD ATTORNEYS, Womble Carlyle Sandridge & Rice PLLC, Washington, DC.

For Qwest Communications Corporation, a Delaware corporation, Defendant: George Baker Thomson, Jr., LEAD ATTORNEY, Qwest Services Corporation, Denver, CO; Thomas John Welk, LEAD ATTORNEY, Christopher Wayne Madsen, Boyce Greenfield Pashby & Welk, Sioux Falls, SD.

For Qwest Communications Corporation, a Delaware corporation, Counter Claimant: George Baker Thomson, Jr., LEAD ATTORNEY, Qwest Services Corporation, Denver, CO; Thomas John Welk, LEAD ATTORNEY, Boyce Greenfield Pashby & Welk, Sioux Falls, SD.

For Sancom, Inc., a South Dakota Corporation, Counter Defendant: Chris A. Nipe, LEAD ATTORNEY, Larson & Nipe, Mitchell, SD; Jeffrey D. Larson, LEAD AT-TORNEY, Woonsocket, SD; Michael B. Hazzard, Ross A. Buntrock, LEAD ATTORNEYS, Womble Carlyle Sandridge & Rice PLLC, Washington, DC.

JUDGES: KAREN E. SCHREIER, CHIEF JUDGE.

OPINION BY: KAREN E. SCHREIER

OPINION

    ORDER DENYING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Plaintiff, Sancom, Inc., [*2] moves to dismiss the counterclaims asserted by defendant, Qwest Communications Corporation (Qwest). The motion is denied.

**FACTUAL BACKGROUND**

    Viewed in the light most favorable to the nonmoving party and as alleged in the counterclaim, the facts are as follows: There are two types of telephone calls: local calls and long distance calls. Local calls originate and terminate within one designated local calling area and local exchange carriers (LECs) usually serve customers within a local calling area. There are incumbent LECs, which are traditional providers of local exchange services in an area and competitive LECs, which are new entrants whose purpose is to offer local services in competition with the incumbent LECs. In contrast, long distance calls are carried by a long distance carrier, known as an interexchange carrier (IXC), from one local calling area to another local calling area. When a customer makes a long distance telephone call, the call is originated on wires and facilities owned by the LEC serving the end-user customer making the call and the call is terminated over wires and facilities owned by the LEC serving the end-user customer receiving the call. Long distance companies [*3] pay "originating" access charges to the LECs that serve customers who initiate long distance calls within their local calling area and pay "terminating" access charges to the LECs that serve customers who receive long distance calls within their local calling area. Local telephone companies obtain access charges from the IXCs to assist with the cost of the local plant used in the origination and termination of interstate calls. Such access charges "are determined by tariffs which carriers file either with the Federal Communications Commission (FCC) (when the charges pertain to purely interstate communications) or the applicable state

utility commissions (when the charges pertain to intra-state communications)." *Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Board, 476 F.3d 572, 574 (8th Cir. 2007).*

Turning to the specifics of this case, Sancom is a South Dakota competitive LEC that provides telecommunication services to its customers and originating and terminating access services to long distance companies. Being an IXC that provides long distance services, Qwest utilizes the originating and terminating services provided by Sancom. Because Sancom's access charges pertain to [*4] interstate and intrastate communications, Sancom filed tariffs with both the FCC and the South Dakota Public Utilities Commission (SDPUC), pursuant to federal and state regulations.

Qwest began purchasing tariffed access services from Sancom in 2005. Sancom argues that Qwest unilaterally stopped paying for access services on May 1, 2007. As a result, Sancom filed suit against Qwest, seeking to collect charges it alleges are due under the applicable tariffs. In its answer to Sancom's complaint, Qwest asserts ten counterclaims based upon both federal and state law. Qwest alleges that Sancom, together with the Free Calling Service Companies (FCS companies), participated in a "traffic pumping scheme," resulting in an increase in access charges billed to Qwest.

More specifically, Qwest alleges that Sancom has entered into business relationships with the FCS companies to increase the long distance traffic delivered through Sancom's switches, which forces Qwest to pay high terminating access charges. The FCS companies provide individuals with free access to chat rooms, free conference bridge lines, free pornographic or other adult content calls, free voice mail, free podcasts, and free international [*5] calling. The FCS companies offer these services to the public for free and encourage their customers to make long distance calls to a number assigned to Sancom in South Dakota. Qwest alleges that the FCS companies purposefully partnered with Sancom because it is a competitive LEC and, therefore, is eligible to file a higher tariff rate. The higher revenue gained by Sancom as a result of the increased long distance calling was partly redistributed to the FCS companies. Qwest also argues that its obligation to pay access charges for any of the traffic directed to the FCS companies is negated because the collection of access tariff revenue for the purpose of sharing that revenue with the FCS companies and through the "traffic pumping" scheme is inconsistent with the purpose of the access charges.

Further, Qwest asserts that it can refuse to deliver long distance calls destined for companies like the FCS companies, but that it must know the exact telephone numbers utilized by the FCS companies in order to refuse to deliver the calls. Qwest asserts that Sancom routinely assigns different telephone numbers that their participants may call in order to obtain "free" services to prevent Qwest [*6] from tracking and refusing to deliver calls intended for the FCS companies. Furthermore, Qwest alleges that because the FCS companies bridge multiple users from different locations together in a manner that does not terminate the call to a local customer in Sancom's local service area, Sancom is collecting terminating access revenue in violation of the law and its own tariffs. Finally, Qwest argues that Sancom is discriminating against its other customers when it shares revenues on a preferential basis with the FCS companies.

## MOTION TO DISMISS STANDARD

In considering a motion to dismiss a counterclaim, the court assumes all facts alleged in the counterclaim are true, construes the counterclaim liberally in the light most favorable to the claimant, and should dismiss only if "it appears beyond a doubt that the [claimant] can prove no set of facts which would entitle the [claimant] to relief." *Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994).* "The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not [*7] the test." *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974),* overruled on other grounds by *Davis v. Scherer, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017, 82 L. Ed. 2d 139 (1984).*

## DISCUSSION

Qwest responded to the complaint of Sancom with a set of ten counterclaims. In its motion to dismiss Qwest's counterclaims, Sancom argues that Qwest's claims are barred by the filed rate doctrine. Sancom further argues that dismissal of the counterclaims is appropriate in light of the recently issued decision of the FCC in Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Company, Mem. Op. & Order, File No. EB-07-MD-001, FCC 07-175 (Oct. 2, 2007). Sancom also argues that Qwest failed to state a claim with respect to each individual counterclaim.

### I. Filed Tariff Doctrine

*Section 203(a)* of the Communications Act requires telecommunications carriers to file a tariff with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." *47 U.S.C. § 203(a).* Telecommunications carriers cannot "charge, demand, collect, or receive a greater or less or different compensation" for services subject to tariffs. *47 U.S.C. § 203(c).* [*8] These provisions are modeled after

provisions contained in the Interstate Commerce Act, and therefore, courts have found that the filed rate doctrine applies to telecommunications carriers. *American Tel. & Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214, 221-22, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998).*

" 'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " *Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006)* (quoting *Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir. 2000)*) (alteration in original). The filed rate doctrine prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff. The filed rate doctrine is equally applicable to tariffs set by state regulatory agencies. See *Teleconnect Co. v. US West Commc'ns, Inc., 508 N.W.2d 644, 647-48 (Iowa 1993).*

## A. Standing

Sancom argues that Qwest lacks Article III standing to assert its counterclaims because [*9] the filed rate doctrine prevents the court from altering the access charges that Qwest is required to pay for services. Sancom also argues that under the filed rate doctrine, Qwest has suffered no cognizable injury because it has a duty to pay the rates set forth in Sancom's filed tariffs. But, as explained below, Qwest is not challenging the reasonableness of the rates charged by Sancom. Instead, Qwest is asserting that Sancom is billing it for services not set forth in the tariff. Because Qwest does more than simply allege the tariffs are unreasonable, it has asserted a cognizable injury by virtue of being charged for services not provided for in the tariff.

## B. Counterclaims

Sancom argues that Qwest's objective is to continue to obtain tariffed services from Sancom at rates different from the tariffed prices. Thus, Sancom argues that the filed tariff doctrine acts to bar Qwest's counterclaims in this case. In response, Qwest argues that the filed rate doctrine is not applicable, in part, because it alleges that Sancom did not provide the services contemplated by the tariff. Qwest alleges that the services that it received and were billed for did not qualify as the services set forth [*10] in the tariffs and, therefore, Sancom is attempting to charge the filed tariff rates for services that are not set forth in the tariffs.

"[T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of the rates; and (2) insure that regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004)* (quoting *H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992)).* In other words, there are two principles underlying the filed rate doctrine: (1) nonjusticiability ("preserving the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process [which is] a function that the federal regulatory agencies are more competent to perform") and (2) nondiscrimination ("preventing carriers from engaging in price discrimination as between ratepayers.") *Marcus v. AT & T Corp., 138 F.3d 46, 58 (2d Cir. 1998).*

The nonjusticiability principle acts to preserve the FCC's primary jurisdiction over determinations regarding the [*11] reasonableness of rates charged by regulated carriers. *Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981).* This principle "prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority." *Marcus, 138 F.3d at 61.* With respect to Qwest's contention that Sancom attempted to charge the filed tariff rates for a service that is not set forth in the tariffs, the court does not find that this type of claim is barred by the filed rate doctrine. In making this allegation, Qwest is not asking the court to modify the rates filed by Sancom with the FCC. In the context of a motion to dismiss, the court must assume all facts alleged in Qwest's counterclaims are true, namely that Sancom charged Qwest the filed tariff rates for a service that is not set forth in the tariffs. Because the action does not challenge the legality of the rate approved by the FCC, judicial relief in this case would not disturb the FCC's determination in relation to the reasonableness of the rates. Accordingly, the court finds that these allegations and the claims related to these allegations do not violate the nonjusticiability [*12] principle under the filed rate doctrine.

The nondiscrimination principle ensures that all telecommunications customers are charged the same rate for their service--the rate filed with and approved by the FCC. The filed rate doctrine prevents carriers from negotiating a lower rate with some customers and then charging a rate other than the rate filed with the FCC. *Central Office Telephone Inc., 524 U.S. at 223.* This explains why courts have no power to adjudicate claims that would "invalidate, alter, or add to the terms of the filed tariff." *Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1084 (9th Cir. 2006).* With respect to Qwest's contention that Sancom did not provide the services set forth in the tariff, the court does not find that this type of claim is barred by the filed rate doctrine. Qwest is not challeng-

ing the validity of the rate, but rather it argues that the arrangement between Sancom and the FCS companies results in the provision of services not covered by the tariff. In the context of a motion to dismiss, the court must assume the allegations of Qwest to be true, that it was billed for tariffed services that it did not receive. A ruling in Qwest's favor would not [*13] result in Qwest paying rates different from other entities who obtained services properly categorized under the tariff from Sancom. The court therefore finds that these allegations and claims related to these allegations are not barred by the nondiscrimination principle pursuant to the filed rate doctrine.

Further, Sancom filed suit seeking to recover fees it alleges are owed under the tariff. To recover for amounts charged pursuant to a tariff, Sancom "must demonstrate (1) that they operated under a federally filed tariff and (2) that they provided services to the customer pursuant to that tariff." *Advamtel LLC v. AT & T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000).* Under this second element, Sancom must show it provided services pursuant to the tariff, which is the converse of what Qwest alleges in its counterclaims. The court finds that because this determination is appropriately made by the fact-finder with respect to Sancom's claims, that further supports the court's finding that the allegations contained within the counterclaims, as discussed above, are not barred by the filed rate doctrine.

Although the filed rate doctrine does not bar Qwest's claims that Sancom charged it [*14] the filed tariff rates for a service that is not set forth in the tariffs and that Sancom billed it for tariffed services that it did not receive, the court does find that the filed rate doctrine does bar Qwest's assertions that the tariffs are "void ab initio" because Sancom is not a rural competitive LEC. Sancom has filed tariffs as a rural competitive LEC and Qwest's allegations are effectively a direct challenge to the validity of that rate. Further, there is no indication that Sancom's status has ever been questioned by the FCC. If the court were to invalidate the tariffs with respect to the services provided to Qwest and subsequently apply a different tariff rate to those services, the result of that determination would be that the court would be setting the rate and other long distance carriers would pay a different rate than Qwest. This is exactly what the nonjusticiability and discriminatory principles under the filed rate doctrine are intended to prevent. See, e.g., *H.J. Inc., 954 F.2d at 489-92.* Accordingly, to the extent that Qwest alleges that Sancom's tariffs are void because Sancom is not a "rural competitive LEC," that argument is dismissed by the court.

## II. Farmers

Sancom [*15] also argues that Qwest's counterclaims are precluded by the FCC's recent decision in Farmers. The FCC's ruling in Farmers should be given deference by this court pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).* [1] In Farmers, the FCC faced a factual situation similar to the one present in this case. In that case, Qwest alleged that Farmers, a local exchange carrier similar to Sancom, violated the Communications Act. Farmers, P 1. Qwest alleged that Farmers intended to participate in a scheme, which would increase traffic to its network through agreements with conference calling companies. Id.

> 1 The court notes that the FCC granted an order for reconsideration of the Farmer decision in January of 2008 to allow further development of the factual record. See Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co., Order on Reconsideration, File No. EB-07-MD-001, FCC 08-29 (Jan. 29, 2008).

A significant difference between Farmers and Sancom in this case is that Farmers was an incumbent local exchange carrier rather than a competitive local exchange carrier. As an incumbent LEC, the tariff rate [*16] for Farmers was determined by the rate of return it achieved in previous time periods. The essence of Qwest's complaint was that after establishing the tariff rate during a period of low traffic, Farmers dramatically increased traffic through agreements with the conference calling companies, thus earning an unreasonably high rate of return.

The FCC determined that during the period in question, Farmers had vastly exceeded its prescribed rate of return. Id. at P 25. Despite this finding, the FCC found that Farmers, although it "manipulated the Commission's rules to achieve a result unintended by it," it did not act in an unlawful manner. Id. The FCC found that the conference calling companies were appropriately identified by Farmers as end users under the relevant tariff. Id. at P 35. The FCC further found that Farmers' payment of "marketing fees" to the conference calling companies did not affect the status of those companies as customers of Farmers. Id. at P 38.

Although the issues that confronted the FCC in Farmers are similar to those at issue in this case, the court does not find that the FCC's findings are dispositive at this stage of the litigation. In Farmers, both parties [*17] had the opportunity to conduct discovery, and the FCC relied on the developed record in determining that Farmers had acted lawfully under the tariff. See id., PP 30-39.

Further, the claims made by Qwest in this case differ in some ways from the claims made by Qwest in Farmers. Qwest alleges that most, if not all, of the services being provided to the FCS companies do not terminate in the local exchange area in which Sancom collects access charges. Qwest alleges that the FCS companies provide a service that does not terminate a call at their equipment but simply facilitates communication between multiple parties, almost none of whom reside in Sancom's local service area. The court acknowledges that a similar argument was made before the FCC in Farmers and rejected. But here, Qwest further alleges that Sancom is essentially delivering traffic to the FCS companies and is not receiving terminating access charges for such services. Qwest also alleges that the FCS companies' equipment is actually located outside of Sancom's service territory. Finally, Qwest asserts that the FCC has specifically given long distance carriers, like Qwest, the ability to refuse to deliver long distance calls [*18] that are delivered to the FCS companies. At this stage of the litigation, without a developed record regarding the relationship between the FCS companies and Sancom, the court must accept Qwest's allegations as true and therefore the situation faced by the FCC in Farmers is distinguishable. For these reasons, the court finds that the FCC's ruling in Farmers does not mandate dismissal of Qwest's counterclaims.

## III. Individual Counterclaims

### A. Violation of *47 U.S.C. § 201(b)*

Counterclaim 1 alleges that Sancom acted in violation of federal law, namely *47 U.S.C. § 201(b)*, by charging Qwest access tariffs for terminating long distance calls when Sancom did not in fact terminate such calls. Sancom argues that this claim is prohibited by the filed rate doctrine because Qwest seeks a determination of the reasonableness of Sancom's tariffs, which are filed with the FCC. Viewing the counterclaim in the context of a motion to dismiss, the court finds that Qwest has alleged that Sancom billed Qwest for services that were not provided and thus has made allegations sufficient to state a claim for a violation of *47 U.S.C. § 201(b)*.

### B. Violation of *47 U.S.C. § 201(b)*

Counterclaim 2 similarly alleges that [*19] Sancom acted in violation of federal law, namely *47 U.S.C. § 201(b)*, by charging Qwest for access tariffs for terminating long distance calls when Sancom did not in fact terminate such calls. Sancom argues that this claim is prohibited by the filed rate doctrine because Qwest seeks a determination of the reasonableness of Sancom's tariffs, which are filed with the FCC. Assuming that all of the allegations in the counterclaim are true, as the court is

required to do when considering a motion to dismiss, the court finds that Qwest has alleged that Sancom billed Qwest for services that were not provided. As a result, Qwest has made allegations sufficient to state a claim for violation of *47 U.S.C. § 201(b)*.

### C. Violation of *47 U.S.C. § 203(c)*

Counterclaim 3 alleges that Sancom acted in violation of federal law, namely *47 U.S.C. § 203(c)*, by billing Qwest for services that it did not provide. Sancom argues that this claim is barred by the filed rate doctrine, because Qwest is asking the court to void Sancom's tariffs and apply a different rate. Viewing the counterclaim in the light most favorable to Qwest, the court finds that Qwest has successfully alleged that Sancom billed Qwest for tariffed [*20] services that were never provided and therefore has made allegations sufficient to state a claim for a violation of *47 U.S.C. § 203(c)*. Accordingly, Sancom's motion to dismiss is denied.

### D. Common Law Fraudulent Concealment

Counterclaim 4 alleges that Sancom provided the FCS companies with different telephone numbers so that the FCS companies could repeatedly change their telephone numbers to prevent Qwest from discovering the phone numbers. Qwest alleges Sancom did so because Qwest has a right to refuse to deliver calls destined for the FCS companies. Based upon the above allegations, Qwest asserts that Sancom knowingly failed to disclose this information to Qwest with the intent to deceive and defraud Qwest, that Sancom had a duty to disclose this information to Qwest, and that Qwest relied on Sancom's representations because it was unable to refuse to deliver calls to the FCS companies. Under South Dakota law, to successfully prove fraudulent concealment, the plaintiff must show: "(1) the suppression of a fact by one who is bound to disclose it, or (2) the suppression of a fact by one who gives information of other facts which are likely to mislead for want of communication of that [*21] fact." *Milligan v. Waldo, 2001 SD 2, 620 N.W.2d 377, 380 (S.D. 2001)*.

Sancom argues that it has no duty to disclose to Qwest the identity of its end-user customers and that even if Sancom had disclosed the telephone numbers of Sancom's customers, it is unlawful for Qwest to refuse to deliver the calls the FCS companies. Qwest specifically pleaded in its counterclaim that Sancom had a duty to disclose the information to Qwest, that Sancom failed to do so with the intent to deceive and defraud Qwest, and that, as a result, Qwest was forced to deliver calls to the FCS companies.

Sancom also argues that fraudulent concealment is not a cause of action in South Dakota but rather a

2008 U.S. Dist. LEXIS 49491, *

mechanism used to toll the statute of limitations. The court notes that the two cases cited by Sancom in this regard deal with medical malpractice and accountant malpractice claims. See *Bruske v. Hille, 1997 SD 108, 567 N.W.2d 872, 875 (S.D. 1997)* and *Witte v. Goldey, 1999 SD 34, 590 N.W.2d 266, 269 (S.D. 1999)*. While fraudulent concealment may only act to toll the statute of limitations in the area of malpractice, the court has found no South Dakota authority that requires that such a claim be treated in a similar manner in the context of this case. [*22] In fact, in Milligan, the South Dakota Supreme Court treated a claim for fraudulent concealment as a claim alleging deceit under *SDCL 20-10-2(3). Milligan, 620 N.W.2d at 379-380*.

Sancom finally argues that this counterclaim violates the filed tariff doctrine. As discussed above, Qwest asserts that Sancom billed it for services that Qwest did not receive. Assuming all facts alleged in the complaint to be true, and construing the complaint liberally in the light most favorable to Qwest, the court finds Qwest has alleged sufficient facts to state a claim under the fourth counterclaim.

### E. Common Law Unfair Competition

Counterclaim 5 alleges that Sancom has violated customary standards of business ethics, federal statutes, and state regulatory law. More specifically, Qwest alleges that Sancom has misused its inherent and exclusive power over terminating access services by redistributing a certain portion of its profits to the FCS companies. Under South Dakota law, "[t]he tort of unfair competition does not have specific elements." *Setliff v. Akins, 2000 SD 124, 616 N.W.2d 878, 887 (S.D. 2000)*. Rather, " 'it describes a general category of torts which courts recognize for the protection of commercial interest.' [*23] " Id. Thus, "damages for unfair competition results from satisfying the elements of an underlying tort." *Id. at 887-88*. For example, tortious interference with contract or improper use of trade secrets can serve as the basis for a claim for unfair competition. See id.

Sancom argues that this counterclaim is barred by the filed rate doctrine because Qwest is attempting to avoid paying tariffed rates for the tariffed access services that Qwest received from Sancom. As explained above, Qwest alleges that Sancom billed it for services that Sancom failed to provide. Under the circumstances of this case, the court finds that Qwest may be able to prove a set of facts which would entitle it to relief and, thus, Sancom's motion to dismiss is denied. Sancom further argues that this counterclaim fails to state a claim because under Farmers, Sancom's activities are lawful. As discussed above, the court finds that the FCC's determinations in Farmers are not dispositive at this state of the litigation. Because the court finds that Qwest has alleged sufficient

facts to withstand Sancom's motion to dismiss in relation to its eighth counterclaim, tortious interference with contract, as discussed below, [*24] Qwest's unfair competition counterclaim also withstands Sancom's motion to dismiss.

### F. Civil Conspiracy

Counterclaim 6 alleges that Sancom conspired with the FCS companies to artificially increase the volume of long distance traffic that was routed to Sancom's networks in order to allow Sancom to charge an unlawful rate for services it did not perform. Under South Dakota law, to prove a prima facie case of civil conspiracy, the plaintiff must prove the following five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *Setliff, 616 N.W.2d at 889*.

Sancom argues that Qwest has not properly alleged a claim for civil conspiracy because it has not alleged any unlawful acts. In its counterclaim, however, Qwest alleges that Sancom was involved in an illegal scheme that resulted in charging Qwest for services not provided for in the applicable tariffs. As discussed in more detail above with respect to the Farmers decision, Sancom's argument that the scheme was lawful based upon the FCC ruling [*25] are not dispositive at this stage of the litigation. Assuming all facts alleged in the counterclaim to be true, and construing the counterclaim liberally in the light most favorable to Qwest, the court finds Qwest has alleged sufficient facts to state a claim under the sixth counterclaim. Thus, Sancom's motion to dismiss is denied.

### G. Breach of Contract

Counterclaim 7 alleges a claim of breach of contract against Sancom. Qwest asserts that Sancom's federal and state tariffs constitute contracts between Sancom and any purchaser of terminating access services, which includes Qwest. Qwest alleges that Sancom is liable for breach of contract because it billed Qwest for services it did not provide. Sancom asserts that these claims are barred by the filed rate doctrine. As discussed above, to the extent Qwest alleges that Sancom charged Qwest for services not covered by the tariff, and the tariff creates a valid contractual relationship, Qwest's individual claim is not barred by the filed rate doctrine. The court finds that Qwest has alleged sufficient facts that, if true, give rise to its claim for breach of contract. Accordingly, Sancom's motion to dismiss is denied.

### H. Tortious Interference [*26] with Contract

Counterclaim 8 alleges that Sancom tortiously interfered with contracts between Qwest and other long distance carriers, including Global Crossing and Level 3, that specifically allowed Qwest to refuse to deliver calls that these carriers handed to Qwest for delivery to Sancom. Qwest alleges that Sancom entered into a scheme to prevent Qwest from learning the information necessary to make a decision about the appropriate calls to refuse to deliver. Qwest alleges that Sancom's tortious conduct intentionally and improperly interfered with Qwest's ability to take advantage of the rights extended to Qwest under the contracts. Qwest further alleges that these contracts are common in the industry and thus Sancom knew or should have known of the existence and content of these contracts.

To prove a claim for tortious interference, Qwest must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectance [*27] was disrupted." *St. Onge Livestock Co. v. Curtis, 2002 SD 102, 650 N.W.2d 537, 541 (S.D. 2002)*.

Sancom argues that Qwest's counterclaim fails because a valid business relationship and expectancy between Qwest and other long distance carriers never existed. In this regard, Sancom argues that Qwest could not have lawfully blocked the calls at issue here. A review of Qwest's counterclaim, however, demonstrates that Qwest specifically alleges that the FCC has given long distance carriers, like Qwest, the ability to refuse to deliver long distance calls destined for companies like the FCS companies. Sancom also argues that it did not intentionally and unjustifiably interfere with Qwest's contracts with other long distance companies because it has no duty to volunteer to provide Qwest with the numbers it assigns to a particular class of consumers. In its counterclaim, Qwest specifically alleges that Sancom's intentional actions prevented it from learning the information it needed to know in order to determine whether to deliver calls. Assuming all allegations in the complaint to be true, the court finds that Qwest's allegations are sufficient to state a claim for tortious interference with contract. Finally, [*28] Sancom argues that this counterclaim is prohibited by the filed tariff doctrine. As mentioned above, because Qwest is not challenging the reasonableness of the rates, this doctrine does not bar the specific claim made by Qwest in this case. Accordingly, Sancom's motion to dismiss is denied.

**I. Unjust Enrichment**

Counterclaim 9 alleges a claim for unjust enrichment against Sancom. "Unjust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.' " *Hofeldt v. Mehling, 2003 SD 25, 658 N.W.2d 783, 788 (S.D. 2003)* (quoting *Parker v. Western Dakota Insurors, Inc., 2000 SD 14, 605 N.W.2d 181, 187 (S.D. 2000))*. Qwest alleges that Sancom has received substantial profits from Qwest under Sancom's tariffs and that it would be unjust for Sancom to enrich itself at the expense of Qwest.

Sancom argues that because an express contract exists between the parties, the equitable remedy of unjust enrichment cannot be relied upon by Qwest. In support of this argument, plaintiffs cite *Thurston v. Cedric Sanders Co., 80 S.D. 426, 125 N.W.2d 496, 498 (S.D. 1963)*, which held "where there is a valid express contract existing between parties in [*29] relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or a suit on *quantum meruit.*" In this case, however, Qwest has alleged that the contract does not cover the services provided by Sancom. Assuming the facts alleged by Qwest to be true, Qwest has successfully alleged that it is entitled to recover damages under a theory of unjust enrichment. Accordingly, Sancom's motion to dismiss is denied.

**J. Declaratory Judgment**

Counterclaim 10 seeks a judicial determination that Qwest should not be required to pay the invoiced fees for services provided in connection with calls generated by the FCS companies. Qwest also seeks declaratory judgment that Sancom is not providing terminating access services to Qwest with calls routed to the FCS companies and that the tariffed access rates charged by Sancom are unlawful. Sancom argues that this attempt at relief is barred by the filed rate doctrine and the Farmers decision.

As discussed above, Qwest's allegations that it did not receive services under the tariff must be assumed to be true for purposes of a motion to dismiss. If Qwest did not receive tariffed services, it has a valid claim for declaratory relief [*30] with respect to Sancom's invoices charging Qwest for those services. Therefore, Sancom's motion to dismiss is denied.

Based on the foregoing, it is hereby

ORDERED that plaintiff's motion to dismiss (Docket 15) is denied.

IT IS FURTHER ORDERED that defendant's request for oral argument on motion to dismiss (Docket 25) is denied.

Dated June 26, 2008.

2008 U.S. Dist. LEXIS 49491, *

BY THE COURT:                          KAREN E. SCHREIER

/s/ Karen E. Schreier                  CHIEF JUDGE